( Decided November 2nd, 1865.)

―――――

THOMAS ANDERSON *vs.* JOHN W. BAKER, GEORGE ERNEST and JULIAN MAGRUDER.

THE POWERS OF A CONVENTION OF THE PEOPLE OF A STATE, assembled to frame a form of Government, are no where defined. It is the right of the people to alter or abolish, or institute a new Government, "laying its foundations on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness."

The Convention is the depository of the residuary or reserved sovereignty of the people, unlimited except so far as restrained by the Constitution of the United States, and the moral law. Whether their action is dependent upon the subsequent ratification of the people or not, is not clearly established; but when ratified and adopted, or acquiesced in, their acts are unquestionable within the limits prescribed.

THE REGULATION OF THE ELECTIVE FRANCHISE, AN UNQUALIFIED RIGHT OF THE STATES.—Among the absolute, unqualified rights of the States, is that of regulating the elective franchise. It is the foundation of State authority. The most important political function exercised by the people in their sovereign capacity. Whilst "the right of the people to participate in the Legislature, is the best security of liberty and foundation of all free Government," yet it is subordinate to the higher power of regulating the qualifications of the electors and the elected.

CITIZENSHIP AND RIGHT OF SUFFRAGE NOT INSEPARABLE.—Citizenship and suffrage, are by no means inseparable; the latter is not one of the universal, inalienable rights, with which men are endowed by their Creator, but is altogether conventional.

SUFFRAGE NOT A RIGHT OF PROPERTY, OR ABSOLUTE PERSONAL RIGHT.— None of the elementary writers include the right of suffrage among the rights of property or person. It is not an absolute, unqualified, personal right.

Anderson *vs.* Baker, *et al.*

THE IMPROPER WITHHOLDING OF THE RIGHT OF SUFFRAGE BY JUDGES OF ELECTION, OR REGISTRARS, IS *damnum absque injuria.*—In one sense, if the citizen is a legal voter, he has the right to vote, and is injured if deprived of it; but the law·has appointed a means, whereby his right to vote is decided, and for that purpose has provided judges to determine that question, and has also provided the most careful guarantees for a proper discharge of duty by the judges, by the mode of their selection and their oaths of office, and if the citizen has had a fair and honest exercise of judgment by a judicial officer in his case, it is all the law entitles him to, "and although the judgment may be erroneous, and the party injured, it is *damnum absque injuria,* for which no action lies."

——: DISQUALIFICATON OF VOTERS.—The appellant's position that the right of suffrage is an inalienable right of property, if tenable, would render the amendment of the Constitution of 1801, and all subsequent, excluding that class, inconsistent with the Constitution of the United States, and void. The same power which disqualified free colored men in 1801, enabled the Convention of 1864 to disqualify "all who had been in armed hostility to the United States."

ART. 1, SEC. 2, AND ART. 3, SEC. 41 OF THE CONST. OF MD., AND THE ACT OF 1865, CH. 174, passed in pursuance of its provisions, are not in violation of ART. 1, SEC. 10 OF THE CONST. OF THE U. S., declaring that "no State shall pass any bill of attainder or *ex post facto* law."

POWERS OF REGISTRARS A POLICE OR POLITICAL POWER.—The power conferred on the registrars by the Act of Assembly, carrying into execution the provisions of the Constitution, is a police or political power, closely analagous to that previously committed to the judges of election; a power, on the due exercise of which, the inauguration and succession of the several departments of the Government depend.

THE REGISTRATION LAW (ACT OF 1865, CH. 174,) NOT RESTRAINED BY THE DECLARATION OF RIGHTS.—The Declaration of Rights is a guide to the several departments of Government, in questions of doubt as to the meaning of the Constitution, and "a guard against any extravagant or undue extension of power," but does not control the Constitution itself, when it is clear and unambiguous. As far then as the Registration Law is a legislative enactment of the 1st, 2nd, 3rd, 4th and 5th sections of Article 1 of the Constitution, it is not restrained by the Declaration of Rights, because it proceeds from the same authority, that of the Convention.

BILLS OF ATTAINDER, as they are technically called, are such special acts of legislation, as inflict capital punishments, (or pains or penalties,) upon persons supposed to be guilty of high offences, without any conviction in the ordinary course of judicial proceedings.

EX-POST FACTO LAWS: RETROSPECTIVE LAWS, WHEN NOT WITHIN THE PROHIBITION OF THE CONST. OF THE U. S.—"*Ex post facto* laws are technical expressions, which include every law which renders an act punishable in a manner in which it was not punishable when committed. They relate to penal and criminal proceedings, which impose punishments and

Anderson *vs.* Baker, *et al.*

forfeitures, and not to civil proceedings which effect private rights retro-spectively. Retrospective laws, divesting vested rights, unless " *ex post facto,* " do not fall within the prohibition contained in the Constitution of the United States, however repugnant they may be to the principles of sound legislation.

CONST. OF U. S., 9TH AND 10TH AMENDMENTS. PROHIBITIONS ON THE STATES, ARE NOT TO BE ENLARGED BY CONSTRUCTION;—to do so, would violate the spirit and object of the 9th and 10th amendments to the Constitution of the United States, viz : " The enumeration by the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people."

EX POST FACTO LAWS, FURTHER DEFINED.—The distinctive and obnoxious feature of " *ex post facto* " laws, is the exercise of a judicial function by the Legislature, punishing thereby as *crimes,* acts not before forbidden, or aggravating their punishment.

THE DISQUALIFICATION OF VOTERS BY ART. 1, CONST. OF 1864, AND THE ACT OF 1865, CH. 174, NOT A PUNISHMENT FOR CRIME.—The right of suffrage being the creature of the organic law, may be modified or withdrawn by the sovereign authority which conferred it, without inflicting any punishment on those who are disqualified.

The 4th section of Art. 1 of the Constitution of Maryland, does not declare any act criminal which was not previously so, or add to, alter or change the Criminal Code of the State.

ACTS OF ASSEMBLY NOT TO BE PRONOUNCED UNCONSTITUTIONAL, EXCEPT IN CLEAR CASES.—To declare an Act of a co-ordinate department of the Government, an unwarrantable assumption, or usurpation of power, because it is a violation of a constitutional prohibition, is an exercise of the judicial office of a grave and delicate nature, which never can be warranted but in a clear case. *12 G. & J.*, 438.

The presumption must always be in favor of the validity of laws, if the contrary is not clearly demonstrated: "it must be a clear and unequivocal breach of the Constitution,—not a doubtful and argumentative implication." *15 Md. Rep.*, 476, 477.

APPEAL from the Circuit Court for Montgomery county.

This is an appeal from an order of the Circuit Court for Montgomery county, dismissing the petition of the appellant for the writ of *mandamus* to be directed to the appellees, officers of registration, commanding them to register his name on the list of registered voters for said county and district wherein he resided. The facts of this case are fully stated in the several opinions filed by the Justices of this Court.

Anderson *vs.* Baker, *et al.*

The cause was argued before Bowie, C. J., and Bartol, Goldsborough, Cochran and Weisel, J.

*Robert J. Brent* and *Thos. G. Pratt,* for the appellant:

I. The petitioner is entitled to the summary relief of the writ of *mandamus.*

II. That all those provisions of the registry law, which provide the mode of appointment of the officers of registration, and which authorize them to determine the qualification of voters, under section 4th of Article 1st of the Constitution, including the test oath, are null and void, and contrary to the Bill of Rights and the Constitution of Maryland.

III. That the disqualifying clauses and the test oath of the 4th section of Article 1st of the present Constitution, and the registry law of March 12th, 1865, so far as the latter undertakes to carry out the disqualifications declared by said section 4, are null and void, by reason of the prohibitions of the Constitution of the United States.

IV. The disqualifying clauses and test oath of section 4th of Article 1st of the Constitution of Maryland, and so much of the registry law of March 24th, 1865, as undertakes to carry the same into effect, are null and void, as being contrary to the fundamental principles of justice and reason, and of American Republican Government.

I. The writ of *mandamus* is the proper remedy in this case. 3 *Black. Com.,* 110. *Tapp. on Mand.,* 64, and cases cited. *Runkel vs. Winemiller,* 4 *H. & McH.,* 429. *State, relator McClellan vs. Graves,* 19 *Md. Rep.,* 374. See, also, cases cited in the appellants' argument in *Hardesty, et al., vs. Taft, et al.,* 23 *Md. Rep.,* 512. The petitioner has no means of obtaining his elective franchise except in a proceeding of this character. If he recover damages, that would not give him the franchise; and if the Courts do not sustain proceedings of this character, the elective franchise of the citizens of Maryland will be subject to the uncontrolled caprice of the Executive appointees.

II. The registry law is in contravention of the Constitution of Maryland.

Sec. 1 of the registry law, authorizes the Governor of the State to appoint "from among the citizens of the State most known for loyalty, firmness and uprightness, three persons for each ward in the city of Baltimore, and for each election district in the several counties of the State, who shall be styled officers of registration."

The power to appoint is given to the Governor. It is submitted that this is subject to section 13 of Article 2 of the Constitution, which provides that the Governor "shall nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment or election is not otherwise herein provided for, unless a different mode of appointment be prescribed by the law creating the office."

The Legislature has not selected "a different mode of appointment," for it has selected the Governor to appoint, but it has not changed the condition under which the Constitution says the Governor only shall exercise the power of appointment. It follows that the Governor should have nominated these officers to the Senate, which was in session at the passage of the law.

The intent of the Legislature to aggrandize the power of the Governor and his agent, and to make him and them the sole despotic dispensers of the elective franchise, in exclusion of the Constitutional jurisdiction of the Judiciary, and in violation of the Constitutional rights of the citizen, is manifested :

1. By withdrawing from the local constituencies the usual privileges of selecting officers whose functions relate entirely and exclusively to the electoral matters in the respective districts and wards of those constituencies.

2. By conferring on the Governor, for the first time in the history of the State, the unusual power of appointing officers for the wards of the city of Baltimore and the election districts of the various counties.

3. By removing from the Governor the ordinary restraint of the approval of his appointments by the Senate.

4. By dispensing with the usual and ordinary qualifications, which provides that the residence of every officer shall be in the district, ward or county in which he exercises his functions.

5. By creating, for the first time in the history of Maryland, a new set of officers, called officers of registration, and vesting them with the most despotic powers, including not only the ordinary judicial powers, which belong to officers of election, of determining the usual qualifications of age, color, residence, alienage, &c., but the unusual functions of trying citizens judicially for disloyalty, and if in their judgment the guilt of the citizen be established, then to forfeit his franchise of voting.

The intent thus manifested, is carried out by the registration law, which is claimed to be contrary to the Constitution of Maryland.

It will be seen that the Legislature has conferred on these Executive agents, called "officers of registration," the power "to enquire into and ascertain if any person has not done any of the acts which are declared in the 3rd, 4th and 5th sections of Article 1, as causes of disqualification; and if the evidence brought to their knowledge shall satisfy them that he is disqualified," they shall "carefully exclude him, even if he have taken the test oath prescribed by section 4 of Article 1."

From this it appears that the test oath is not intended as a proof of qualification, but is only to be regarded as some evidence "brought to the knowledge" of the registrars, and is to be passed on by them as other testimony.

The "careful exclusion" from the list of qualified voters, is based upon the conclusion or judgment arrived at by the registrars, on the evidence "brought to their knowledge after diligent inquiry." To prosecute this inquiry or trial, they are invested with the power to attach, arrest and commit citizens of the State, in the same manner as a Judge of

a Circuit Court, with this difference, nevertheless, that the registrars, or Executive agents, are not to be troubled with the necessity of informing the citizen of the nature of the charge against, or of confronting him with the witnesses against him, or giving notice of the time of trial, or of making any written record of the trial, or even of the "acts" for which he has been tried; but they must enter in the "seventh column of the books of registration" their judgment, by simply writing, according to section five of the registration Act, the word "disqualified for disloyalty, under the 4th section of Article 1st of the Constitution."

The registry Act in no manner undertakes to designate what species of evidence shall be had by the registrars in the examination of cases; it only says, "if the evidence brought to their knowledge shall satisfy them," they shall disfranchise the citizen.

When the vast importance of this delegation of disfranchising powers to the registrars is considered, it is vital to determine upon what evidence they are to proceed.

If "letters, goods, money or information be unlawfully sent within the lines of the enemies of the United States," it is declared, in the 5th exception, to be "an adherence to said enemies," punishable with disfranchisement. Now as the registrars are required by the registry law to determine the guilt of the citizen in a case like this, many questions necessarily arise, which must be disposed of before their judgment can be properly rendered. It must be determined "where the lines of the enemy" were at the time of the alleged act. Section 4th of Article 1 does not provide that the "unlawful sending of the money, goods, letters or information" should be from within the State of Maryland to within the enemy's lines; on the contrary, such general terms are used relative to this class of acts, as well as to all others, except that contained in the 3rd exception, as to preclude the idea that it is or was necessary that any of these acts should have been committed within the jurisdiction of Maryland.

Under the registry law, the registrars are authorized to try the applicant for registration for any acts or words of disloyalty, even if committed in the State of Louisiana; now we know, historically, that the military lines of the opposing armies in the State of Louisiana, changed repeatedly. And as no provision is made in the law for, and no general practice has obtained before the registrars of, informing citizens of the nature of any charge against them, nor of the evidence brought against them, the vast range of facts to prove these extra-territorial acts must be gone over *ex parte*, and if the registrars are "satisfied," the brief judgment of "disqualified for disloyalty" entered in the seventh column of the "books of registration," disfranchises forever the citizen, without any information of the nature of the crime of which he has been convicted.

The respondents claim that the State, in its Constitution, has declared the qualifications of voters, excluding disloyal persons, and that the power to exclude the parties falling under the disqualifying clause in the Constitution, is legally vested in the officers of registration.

It has been shown by the Registry Act:

1. That the registrars are mere Executive officers or agents.

2. That they have the power of summoning witnesses to prove the qualification of voters, and they are invested with judicial functions, the same as a Judge of the Circuit Court, for the purpose of issuing summons, attachments and commitments.

3. That they are authorized to pronounce judgment against any citizen, for acts committed within or without the jurisdiction of Maryland, which amounts to a forfeiture of his right to vote.

4. That they are not required to give any notice of the charges to the accused party, or to confront him with witnesses, nor to try him by jury, nor to keep any written record of the trial.

5. That they are only required to record his conviction

in these words, "disqualified for disloyalty, under Article 1 of the Constitution."

6. That the ordinary rules of evidence are disregarded; that the guilt of parties accused of treason and felonies, is permitted to be proved previous to trial and conviction by a competent Court; that a party is required to testify against himself, particularly by section five, wherein the registrars are directed to exact an oath from the citizen to answer any questions touching his right to voting, and this even when his oath may be discredited.

7. That this judgment of the registrars disfranchises the citizen forever, unless discharged by a two-thirds vote of the General Assembly.

We now contend, that the Constitution of Maryland has not authorized the Legislature to confer on the registrars these extraordinary judicial functions.

· Previous to and at the time of the adoption of the Constitution of 1864, there were no such persons as officers of registration known to our laws, and unless the Constitution expressly authorizes the Legislature to confer on officers of registration, the extensive powers granted them in the Registry Act, it cannot be even claimed that the grant is constitutional. Nor can it be claimed that they have the powers of judges of elections, because these offices still exist.

The franchise of voting is property. The right of voting is recognized by law as an inalienable right of property *sui generis*, and cannot be impugned without injury, for which an action may be brought against the judges of election where no special malice or corruption is shown. *Lincoln vs. Hapgood*, 11 *Mass.*, 35. *Parker vs. Ankeny, et al.*, 11 *Ohio*, 372. *Ashby vs, White*, 2 *Ld. Raym.*, 953, 956, and 958.

The right of property, in the elective franchise, is also affirmed in the following cases, but it is considered that special malice or corruption should be alleged before exemplary damages are recovered. *Wheeler vs. Patterson*, 1 *N. H. Rep.*, 88. *Jenkins vs. Waldron*, 11 *Johns.*, 114. *Bevard vs. Hoffman*, 18 *Md. Rep.*, 480.

In addition to this, most of the States, including Maryland, have declared the inviolability of the right of suffrage. It is the badge and symbol of freedom; it is essential to the protection of the citizen, and it belongs of right to every free white male citizen of Maryland, having the required residence and age. Article 7 of the Declaration of Rights. The qualifications which entitle every free white male citizen to vote, are found in Article 1 of the Constitution of 1864. At the time the Convention framed this Article, there was an organized Government in Maryland, formed by citizens, who had rights of property in the elective franchise, in lands, and in other property; and the decisions already quoted, show that the elective franchise is even better protected than ordinary rights of property. The ownership of land and of the elective franchise, stand on precisely the same footing, with the exceptions hereafter explained; even the franchises and privileges of mere corporations were fully protected and secured, and could not be forfeited, except "by due course of law."

The right of voting and holding office was not a privilege, held at the will of the majority, but was, by the law of the land, an inalienable right of property in him who had the necessary qualifications; and in defence of which, he could maintain an action for damages against any one who obstructed or hindered him, in the same manner that he could maintain an action for injury to his freehold or personal property.

Now, the Constitution of 1864, adopted for the qualifications of voters, the identical qualifications existing at the date of its enactment.

The Legislature, in the Registry Act, have fallen into the grave error of considering the act or crime for which, after convicition, a forfeiture of the elective franchise might be decreed, as constituting the disqualification of a voter, while in fact, it is only the judicial conviction which so operates. Article 1, sec. 1 of the Constitution, clearly recognizes this distinction.

The absolute qualifications imposed upon the citizen of the United States, as essential for the exercise of the right of suffrage, were :

1st. The present and existing qualifications or conditions of color, sex, age, and residence.

2nd. The future and contingent qualification or condition subsequent, contained in the expression, relating entirely to the future, "shall comply with the provisions of the 1st Article of the Constitution."

Upon the possession of these qualifications, the citizen becomes an absolute owner of the elective franchise, subject to the condition of forfeiture, just as any other right or property can be forfeited. Forfeiture is the enforcement of a condition annexed to every class or description of rights or property which a citizen can own. Life, lands, liberty, the right of voting and of holding office, are all subject to forfeiture, but this forfeiture, in this country, can only be enforced in due course of law, after trial and rendition of judgment. This elective franchise cannot be lost, except by due course of law. *Taylor vs. Porter,* 4 *Hill,* 140, *et seq.,* BRONSON, J., 146, and reaffirmed in 24 *How. Pr. Rep.,* 152. See, also, *Harris vs. Hardeman,* 14 *How.,* 334. *Starbuck vs. Murray,* 5 *Wend.,* 157. *Jackson vs, Colden,* 4 *Cow.,* 281.

It is alleged that the Legislature derived its power from the Constitution.

In order that the Courts may construe the Constitution, as authorizing the violation of almost every right secured to the citizen, it is necessary that the words of the Constitution be clear and unequivocal.

If the powers granted to the registrars by the Legislature can stand, the great sub-division of the State Government into Legislative, Judicial and Executive Departments, is broken down; and Articles 4, 7, 8, 19, 20, 21 and 22, and particularly Art. 23 of the Bill of Rights of 1864, and sec. 1 of Art. 4 of the Constitution, clash with and are virtually repealed by sec. 4 of Art. 1.

A different construction would assume that the Constitution intended to disfranchise the citizens of the State before trial and conviction; for it must be borne in mind, that all these provisions in sec. 4, relative to "disloyalty," are intended solely to apply to citizens, who have the constitutional qualification of voters; for if they be aliens, they would be already disqualified; and hence, all these provisions of sec. 4, deprive of or forfeit an acknowledged and pre-existing right of suffrage. Now this right of suffrage cannot be lost unless the party be guilty of disloyalty; and the only proof of the guilt of the party is conviction and judgment rendered in due course of law. A citizen cannot be punished, unless found guilty of some act forbidden by law, and no tribunal on the earth, can declare otherwise. It would be a bill of attainder, or of pains and penalties, which latter is included under the description of the bill of attainder, as used in the Federal Constitution, (see *Smith's Commentaries on Statute* and *Constitutional Law, sec.* 230,) and it would possess features more obnoxious than a bill of attainder by the English Parliament, which always includes the names of the parties attainted, who are thus presumed in law to have had a species of trial before the Parliament. But the bill of attainder, which would result from the construction the Legislature has placed on the Constitution, is of this nature, that it attaints citizens in blank, and then institutes an executive commission to fill the blank with names, and thus to enforce its pains and penalties, without the intervention of any judicial authority.

"In the due course of law," no punishment or forfeiture can be enforced against a party until after the judgment of the Court. A conviction does not work any disability. 4 *Black's Com.*, 381, 382. 3 *Kent's Com.*, 12, 13.

Section 4 of Article 1, after declaring that no persons, who have done the enumerated disloyal acts, shall ever vote— meaning, as we contend, after conviction,—goes on to say, "and it shall be the duty of all officers of registration and

judges of election, carefully to exclude from voting or being registered, all persons so as above disqualified. * * * * * And it shall be the duty of the proper officers of registration to allow no person to be registered until he shall have taken the oath or affirmation above set out." This is the first and only mention of "the officers of registration" in the Constitution. Section 41 of Article 3, confers on the Legislature the power "to make effective the provisions of the Constitution, disfranchising certain persons, or disqualifying them from holding office." This last section confers no additional power on the Legislature, as without it, it could have passed laws to make effective any constitutional provision. Hence, the whole claim to the vast power which has just established an oligarchy in the State, rests upon the constitutional provision, that the "officer of registration and judges of election, shall carefully exclude from voting or being registered, all persons so as above disqualified." Under this clause, two-thirds of the citizens of the State have been disqualified.

A careful examination of section 4, shows that the officers of registration have no power to take any testimony, except to ascertain the forfeiture of the elective franchise by conviction of some crime or treason, or by reason of insanity; and if they do not find that the citizen is so disqualified by conviction, he is required to register him upon taking the test oath; and the section of the Registry Act, which authorizes the registrars to administer an additional oath to answer all questions, is clearly unconstitutional.

Nor can it be claimed that the trial by the registrars is a trial by a competent tribunal; for it had been decided in New York, that the due course of the law means a trial by a Court of Justice, known to the common law, and having a jury; and that where the Legislature provided a different tribunal, and authorized it to try, that it was a mockery of the constitutional provisions, and its action null and void. See the case of *Wynehamer vs. People*, 3 *Kernan*, 378.

In conclusion of this branch of the subject, it is asserted broadly, that it is not in the power of the Constitution to divest a citizen of his right of voting for alleged crime, without ascertaining the criminality by means of a trial in due course of law, and that, where the State of Massachusetts, undertook to do this in 1779, in the midst of the Revolution, and when the Legislature represented the entire sovereignty of the people, unrestrained by State or Federal Constitution, its highest Courts have decided that it was not competent to commit so great a wrong.   The particular principle desired at present to be drawn from the following case, is, that no Court will, if possible to avoid it, so construe the Constitution of Maryland, as undertaking to violate the first principles of justice, or to do a vain thing. *Kilham vs. Wood, et al.*, 2 *Mass.*, 236.

The change in Government cannot divest rights.   *Dodge vs. Woolsey*, 18 *How.*, 360.   The test oath must be declared void.   Either Arts. 7, 17, 19, 22 and 23, of the Bill of Rights of 1864, and the great constitutional guaranties of personal security, dependent on them, must be disregarded as nullities, or the test oath of section 4 of Art. 1 must be declared void.

The clash and conflict is obvious, and one or the other must be overthrown.   The oath violates the great provision that no man ought to be compelled to give evidence against himself in a criminal case. · To concede a man a right, and then say he shall not enjoy it, unless he yields up his constitutional rights, is equivalent to destroying it.   *Respublica vs. Gibbs*, 3 *Yeates*, 429.   *Winehamer vs. People*, 3 *Kernan*, 378, *et seq.*   *Green vs. Briggs*, 1 *Curtis*, 411.

These cases fully establish that the test oath of section 4, applicable to voters, is in opposition to the great and cardinal principles of Constitutional Government; and in order to sustain the oath, the Court must be prepared to admit:

1st. That it is constitutional to make a citizen of Maryland bear testimony against himself.

2nd. That if he refuses so to do, then his refusal will, *ipso facto*, confiscate his elective franchise.

3rd. That the retroactive portions of the oath are good, notwithstanding Article 17 of the Bill of Rights, and kindred principles.

The Act of 1865, ch. 174, for the registration of voters, is a nullity to all intents and purposes. In making this objection, we rely on the Constitution of Maryland of 1864, Article 3, section 28.

In the Act of 1865, ch. 174, for the registration of voters, we find no reference to the Code, by articles and sections, either in the title or the body of the Act, but it stands on its face precisely in all respects like an Act passed before the adoption of the Code. This important Act is therefore unsupported even by precedents, while it ignores the stringent requirements of both the Constitutions of 1851 and 1864. That these requirements are vital and touch the validity of the Act, is clearly shown by the case of *Davis vs. State*, 7 *Md. Rep.*, 159.

III. The disqualifications, including the test oath, declared by section 4 of Article 1 of the Constitution of Maryland, adopted in 1864, and the provisions of the registration Act of March 24, 1865, enforcing such disqualification and test oath, are violations of section 10 of Article 1 of the Constitution of the United States, declaring that "no State shall pass any bill of attainder or *ex post facto* law." The United States' Constitution is supreme where it applies. *Dodge vs. Woolsey*, 18 *How.*, 347.

What is an *ex post facto* law? In *Calder vs. Bull*, 3 *Dall.*, 386, Mr. Justice CHASE treats this question of constitutional law at length, and defines *ex post facto* laws as follows:

"I will state what laws. I consider *ex post facto* laws, within the words and intent of the prohibition, (of the Constitution of the United States.)

1. "Every law that makes an act done before the passing of the law, and which was innocent when done, criminal, and punishes such action.

69     v. 23.

2. "Every law that aggravates a crime, and makes it greater than when committed.

3. "Every law that changes a punishment and inflicts a greater punishment than the law annexed to the crime.

4. "Every law that alters the rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender."

· This case has been the basis and foundation of the construction of *ex post facto* laws, and has been followed in all the States, and is reaffirmed in *Fletcher vs. Peck,* 6 *Cranch,* 87; *Watson vs. Mercer,* 8 *Pet.,* 88; *Charles River Bridge vs. Warren Bridge,* 11 *Pet.,* 421; *Carpenter, et al., vs. Commonwealth, &c.,* 17 *How.,* 463.

In *Watson vs. Mercer,* 8 *Pet.,* 110, the Supreme Court of the United States declares that to be an *ex post facto* law "which punishes a party for acts antecedently done, which were not punishable at all, or not punishable to the extent or in the manner prescribed."

What is an *ex post facto* law is shown in 3 *Mad. Papers,* 1399, 1450, 1579, by which BLACKSTONE's definition is adopted and approved, as stated in *Hill vs. Tucker,* 13 *How.,* 463. BLACKSTONE, in enumerating the punishment in criminal cases, speaks of forfeiture of property, or personal disabilities to hold office, &c., as part of the punishment, but remarks, it is the glory of the English law that all these punishments are prefixed by law. 4 *Blackstone,* 377. See, also, 4 *Kent,* 451.

Section 17 of the present Bill of Rights of Maryland, which is copied from the first Bill of Rights, is in the same terms. See, also, 3 *Story on Const.,* sec. 1339.

The disqualifying acts and words mentioned in the Constitution of 1864, are all, by the force of the language used, retrospective, and so are the acts and words enumerated in the test oath. In fact the Constitutional Convention voted down, by twelve yeas to forty-eight noes, a proposition to make the disqualification prospective, beginning on the 1st day of January 1865.

We contend that the Constitution of 1864, by its disqualifying clauses and test oath, makes acts done and words uttered before their enforcement, and which were not punishable when done or uttered, criminal, and punishes such acts and words. What law of Maryland forbade or punished treason against the United States? No such law was in existence at that time; nor is there such a law in existence now; nor is it competent for the State to enact such a law.

The Government of the United States has passed statutes punishing the crimes of treason, misprision of treason, sedition, conspiracy, correspondence with foreign or rebel Governments, or their agents, and enlisting soldiers against the United States. U. S. Statutes, 30th April 1790; 30th June 1799; 31st July 1861; 6th August 1861; 17th July 1862; 25th February 1863. These statutes cover all the offences and provide all the punishments which the United States has deemed proper to declare, and no such punishment as the forfeiture of the elective franchise is declared.

The Constitution of Maryland has undertaken to assist the United States in the punishment of offenders against its laws, and have added *ex post facto* disfranchisement to all the offences punished by those statutes; and has even gone beyond them, and declared acts, and even words, offences against the United States, which that sovereign and paramount Government has never undertaken to punish. The State of Maryland has no statute providing for offences against the United States; its only law on the subject is the Statute of 1862, ch. 235, which provides for the punishment of treason against the State, and disloyal offences. Hence we claim that the disfranchisement of citizens and the exaction of the test oath are *ex post facto* laws, and as such null and void.

As to the oath, see the cases above quoted, in 3 *Yeates* and 3 *Kernan*. In addition, we claim that the disfranchising clauses and test oath are necessarily nullities, because the State of Maryland has nothing to do with treason against the United States, the exclusive power and control over

which is vested in the United States. *The People vs. Lynch,* 11 *Johns.,* 549. *Rawle on Const.,* 140, 141. *Sergeant on Const.,* 371, 372. 3 *Story on Const., sec.* 1296.

Section 4 of Art. 1 of the Constitution and the registry law, are in the nature of a bill of attainder, which includes also bills of pains and penalties. *Smith's Com. on Statute Laws, sec.* 230. And see on this point, 16 *How.,* 385, which calls the Federal Constitution a Bill of Rights to the people of the States. Also see *No.* 44 *of Federalist.*

In forbidding bills of attainders and of pains and penalties, it was the intention of the Federal Constitution to carefully guard the citizen from the loss of any right or property, except by and through the judgment of the ordinary judicial tribunals; but this intention will be defeated, if the Constitution of Maryland he held valid to declare that, without trial and conviction, certain classes of persons be disfranchised and disqualified, and then to provide a special tribunal, not exercising the usual judicial functions, for ascertaining the names of the parties.

One of the qualities of attainder is to deprive the party of the functions of other citizens. 4 *Blackstone,* 38. We claim that disfranchisement of the majority of the citizens of Maryland, by the Registry Act, without the agency of the Judicial Department, is an enormous and oppressive bill of attainder, and of pains and penalties, and is therefore inconsistent and void.

IV. The retroactive disfranchising clauses and test oath of section 4, Article 1, of the Maryland Constitution of 1864, and the Registry Act of March 24th, 1865, are null and void, as contrary to the principles of common and fundamental right, and Constitutional law.

It is well known that, in the theory of the English Government, the Parliament is supreme and imperial, exercising every power of Government absolutely and without restraint. Yet the Judiciary of England never has permitted the enforcement of any law of Parliament, contrary to the fundamental principles of English justice. *Bonham's*

case, 8 *Coke*, 118. *Day vs. Savage, Hob. Rep.*, 87. *London vs. Wood*, 12 *Mod. Rep.*, 687. 1 *Bl. Com.*, 91.

"It is against the principles of liberty and common right to deprive a man of his property or franchise, while he is within the pale of the Constitution, with his hand on the altar, without a hearing and trial by due course of law." *Brown vs. Hummel*, 6 *Barr*, 86.

The power of the Courts to declare laws void, when against common reason, has been much discussed. Can the Legislature give the property of A. to B., or make a man a judge in his own case, or make criminal an act lawful when done?

Whatever may be the decisions of other States, on the powers of the Courts to nullify legislative Acts, because they are contrary to common right and natural justice, in Maryland the question is not open, and the power of the Court is affirmed in the broadest terms. *The Regents, &c., vs. Williams*, 9 *G. & J.*, 408. *Harris vs. Chesapeake & Ohio Canal Co.*, 1 *Md. Ch. Dec.*, 61. *Wright vs. Wright's Lessee*, 2 *Md. Rep.*, 452. The same principles are declared in *Smith's Com. on Stat. & Const. Law*, sec. 149, &c. *Calder vs. Bull*, 3 *Dallas*, 388. *Fletcher vs. Peck*, 6 *Cranch*, 135. *Dash vs. Van Kleeck*, 7 *Johns.*, 5013. *Taylor vs. Porter*, 4 *Hill*, 147. *Wilkinson vs. Leland*, 2 *Peters*, 657. *Wynehamer vs. People, &c.*, 3 *Kernan*, 378. *Borman vs. Middleton*, 1 *Bay*, 252.

The principle of evidence has been changed by the provisions of the law which permit the registrars to be satisfied with the guilt of a party without proof of his conviction. The identical question is presented, when the competency of a witness is to be settled. His infamy must be proved by the record; and even his admission, under oath, of his conviction, does not disqualify him; for the only proof of a man's guilt, is the production of the record of conviction. *The People, &c., vs. Herrick*, 13 *Johns.*, 84. *Hilton vs. Colson*, 13 *Johns.*, 182. *Cushman vs. Loker*, 2 *Mass.*, 108. 1 *Greenlf. on Evidence*, sec. 372.

As to the judgment to be rendered, we do not seek in this

Anderson *vs.* Baker, *et al.*

case to control the discretion of a judicial officer, this cannot be done. The pleadings show that the respondents rely, as the basis of action, on their right "then and there to decide upon the claims of the relator to vote," because of his refusal to take the test oath. This shows that they considered they had the right to require the oath, and to decide in the manner provided by the Registry Act, the validity of which they avow. We insist that no such powers are possessed by them, that they have the power to register a free white male citizen, with the constitutional residence, that this is their only power, and we ask that they be ordered to proceed and act upon his application for registry, without requiring the test oath to be taken, and without proceeding to "inquire into and ascertain, as provided by the Registry Act, whether he has committed any act stated in sections 3, 4 and 5, of Article 1, *as a cause of disqualification*, unless there has been a previous trial and conviction in a Court of competent jurisdiction. If, in the judgment of the respondents, he be not a free white male citizen and resident, as required by law, or if he be disfranchised by reason of a conviction in due course of law, then he is not entitled to registry; but we ask the Court to instruct the registrars that the registry law, in certain of its provisions, is a nullity, and that they must proceed to investigate and decide upon the right of the petitioner to be registered, without enforcing these null and void provisions. We do not ask that they be required to register the petitioner, but that, disregarding the excuses and pleas they set up, derived from a law void in most of its provisions, they proceed to act upon the application for registry, confining themselves to the legal provisions and features of the Act. It is a ministerial duty to proceed and investigate the case, and it is this ministerial duty we ask this Court to instruct the respondents to proceed to execute, disregarding the invalid oath and other conditions insisted on in their answer, affirming the validity of the Registry Law of 1865. If the officer to be coerced has any discretion, he is not to be affected or

controlled by *mandamus*, which only goes to ministerial officers to do a plain duty. *Green vs. Purnell,* 12 *Md. Rep.,* 329.

But even when it is held that the officer has a discretion, and refuses to exercise it, the *mandamus* will go to put his discretion in motion. The Court has a right, by *mandamus,* to compel the exercise of a lawful discretion, and to set it in motion. See 19 *Johns.,* 261.

The comprehensive and efficacious nature of the writ of *mandamus,* and its applicability to a case like the present, is fully shown in *Kunkel vs. Winemiller,* 4 *H. & McH.,* 429. *Harwood vs. Marshall,* 9 *Md. Rep.,* 97, &c. *Hull vs. Supervisor of Oneida,* 19 *Johns.,* 261. *The King vs. Justices of Kent,* 14 *East.,* 395. *The People, &c., vs. Supervisors of New York,* 21 *How.,* 327. *The People, &c., vs. Supervisors of Cortland,* 24 *How.,* 120. *Bacon Abr., Mandamus,* 497, 501, 503.

When there is no other legal remedy, *mandamus* will lie. This Court may either quash the return at once, or have the cause set down for argument. *The King vs. St. Katharine Dock Co.,* 4 *Barn. & Adol.,* 363.

The case of *Bevard vs. Hoffman,* 18 *Md. Rep.,* 479, shows that the petitioner has no right of action against the respondents, because he alleges no special malice or corruption, and hence, unless the writ of *mandamus* lies, he has no remedy. See case in 4 *Barn. & Adol.,* 363. *The People vs. Supervisors,* 10 *Wend.,* 316.

The other remedy must be a legal and not an equitable remedy, nor does the fact that the party refusing is liable to criminal prosecution, destroy the remedy by *mandamus. The People, &c., vs. Mayor of New York,* 10 *Wend.,* 398.

*A. Randall,* Atty. Genl., and *R. M. Williams,* for the appellees :

The appellees will contend, that the Court below correctly refused to quash and set aside the answers and returns of the defendants, and dismissed the petition of the petitioner, for the following reasons assigned therein :

I. This Court has no jurisdiction over the subject matter of this petition.

1st. The political department of the Government of the State of Maryland, having determined that the Constitution was ratified by the people of this State, that decision cannot be inquired into by any judicial proceedings in this State; the judicial power of the State adopts and follows the decisions of the political department on that subject. *Luther vs. Borden,* 7 *Howard's Rep.,* 37 to 40, (*N. S.*) *Miles vs. Bradford,* 22 *Md. Rep.,* 170.

2nd. Because the Courts of this State, having necessarily by their organization, and by the execution of the powers conferred on them by the State Constitution, assumed its validity and obligation upon themselves and the people of this State, the Courts of the United States will adopt and follow these decisions of the Courts of the State in questions concerning the Constitution and Laws of the State, and refuse to entertain any proceeding calling them in question. *Luther vs. Borden,* 7 *Howard's Rep.,* 40, 54. (*N. S.*) *Miles vs, Bradford,* 22 *Md, Rep.,* 170.

3rd. Because the right of suffrage in the States belongs exclusively to themselves, and is restricted and regulated as the people thereof may therein prescribe, with which the Courts of the United States have nothing to do; and so far as the Constitution of the United States has provided for any emergency of this kind, and authorized the General Government to interfere in the domestic concerns of a State, it has treated the subject as political in its nature, and placed the power in the hands of that department, and not in the Courts. *Spragins vs. Houghton,* 2 *Scammon (Ill.,)* 395. 2 *Story on Const.,* 59, 61, 62, 66, *secs.* 581, 582, 583, 585. As to "*Ex post facto* laws, see, *Mayor & C. C. of Balto., vs. Police Commrs.,* 15 *Md. Rep.,* 459. *Smith's Com. on Stat.,* 366, *sec.* 231, *page* 370, *sec.* 234. *Marshall on Const.,* 147, 512. 1 *Kent's Com.,* 408, 409. *Rawle on Const.,* 146. 3 *Story's Com.,* 212, *sec.* 1339. *Baugher vs. Nelson,* 9 *Gill,* 306. As to bills of attainder, see, *Smith's*

Anderson vs. Baker, et al.

Com., 365, sec. 230. 3 Story's Com., 210, sec. 1338. As to guarantee of Republican form of Government, see, 3 Story's Com., 679, sec. 1807, &c. 7 Howard, 1. 2 Curtis' Hist. of Const. of U. S., 471, 472. Davis vs. State, 7 Md. Rep., 158. Keller vs. State, 11 Md. Rep., 525. Parkinson vs. State, 14 Md. Rep., 184.

4th. Because the Constitution and Laws of the State of Maryland, have conferred upon these respondents and their colleagues, special powers and exclusive jurisdiction over the subject of the registration of voters as aforesaid, and no Court of this State has any jurisdiction by mandamus, to control or direct these respondents in the discharge of their official duties. Luther vs. Borden, 7 How., 45. Savage Man. Co., vs. Owens, 3 Gill, 497. Thomas. vs. Owings, 4 Md. Rep., 189.

5th. Because, by the eighth Article of the Declaration of Rights, it is declared that the Legislative, Executive and Judicial powers of Government, ought to be for ever separate and distinct from each other, and no person exercising the functions of one of the said departments, shall assume or discharge the duties of any other,—and the issuing of this mandamus, according to the prayer of the petitioner, would unite and combine powers so declared to be forever separate and distinct; and in fact, make this Court the sole officer of registration, and the exclusive judge of elections. Miles vs. Bradford, 22 Md. Rep., 170.

II. According to the settled authorities in this State and the United States, if this Court had jurisdiction, the petitioner has not made out such a case as will authorize this Court to grant him the mandamus prayed for in his petition.

1st. Because by law, there is a specific and adequate remedy for the supposed grievance of the petitioner; and he is not without redress in the premises, if he have any legal cause of complaint. 4th sec. of 1st Art. of Md. Const. of 1864. Act 1865, ch. 174, sec. 20. 76 Law Lib., 25. Tapping, 10. Rex vs. Bk. of England, 2 Doug., 526.

2nd. Because this Court cannot act by *mandamus*, directly upon these respondents and their colleague, requiring them to do any official act, which by the Constitution and Law is submitted to their judgment and discretion, as officers of the registration of voters, or in any manner control or guide their judgment and discretion, in the ordinary discharge of their official duty. *Watkins vs. Watkins*, 2 *Md. Rep.*, 356. *Thomas vs. Owens*, 4 *Md. Rep.*, 189. *Green vs. Purnell*, 12 *Md. Rep.*, 329. *State vs. Graves*, 19 *Md. Rep.*, 352. *Evan's Prac.*, 510, 511, *note. Brashiers vs. Mason*, 6 *How.*, 102. *Luther vs. Borden*, 7 *How.*, 44. *Tapping on Mand.*, 13. *Evan's Prac.*, 410. Act of 1837, ch. 333.

3rd. Because the issuing of a *mandamus* by the Court, is a summary exercise of high judicial discretion, even where the power so to do is conceded; and will be exercised only in cases of necessity, and with caution and prudent reluctance; and when a case is of doubtful necessity, or its probable effects upon the community of a questionable character, the case does not present those conditions prescribed by the authorities, to entitle it to this writ. But when, as in the present case, to grant this writ would be assuming a power never before exercised on a subject of vital constitutional interest to the people of the entire State, and at a time of great public excitement, by which writ the sworn officers of the State, may be required to violate their oaths if they obey its command,—this Court will not hesitate to exercise that discretion it always has in such cases, to refuse to grant the *mandamus*, and to leave the petitioner to his remedy, with which the law has provided him. *Tapping on Mand.*, 5, 13, 15 and 17, margin. *State vs. Graves*, 19 *Md. Rep.*, 374. *Tapping on Mand.*, 13 and 15. *Evan's Prac.*, 410.

4th. Because the petitioner predicates his right to this writ of *mandamus*, upon the ground, that the first Article of the Constitution of Maryland, and the Act of 1865, ch. 174, are nullities, and of no binding effect in the Courts

of Law or elsewhere; and yet, by the prayer of the petition, he prays that this Court, by *mandamus*, to be directed to these respondents, will command these respondents to execute these nullities and law of no binding effect; and that too, in violation of their provisions. *Tapping on Mand.*, 189, *Id.*, 15.

III. The petitioner having alleged various facts on which he places his right to citizenship, and to be registered as a legal voter, and the two respondents, Baker and Ernest, having denied any knowledge of these facts, and of the petitioner's right to citizenship, and to be registered, and requiring the petitioner to prove the same, and the case being submitted without replication or proof, there is an entire absence of any evidence in the record of the petitioner's right to be registered as a legal voter, and therefore, under no circumstances could the prayer of his petition to be registered be granted by the Court. 7 *How.*, 44.

*Reverdy Johnson*, for the appellant in reply :

The importance of the questions I am about to discuss, cannot be overstated. They admit of no exaggeration. They involve the validity of the Constitution of the State in certain particulars, and the validity of the Act of 1865, professedly passed in pursuance of that Constitution. I shall endeavor to satisfy your Honors, that they are both invalid. I deny their constitutionality, because of the Constitution of the United States, which limits the powers of the States, and, because of their inconsistence with the rest of the Constitution of the State, and the fundamental principles upon which political liberty rests.

The tenth section of the first Article of the Constitution of the United States, contains a limitation upon the power of the States in the particulars stated in that section, or rather, to speak more correctly, not only contains a limitation, but an actual prohibition upon powers which were before vested in the people of Maryland, as well as the people of the other States. When that Consti-

tution was adopted, Maryland was one of the States connected in a Union, such as it was, by force of the Articles of Confederation. Experience had demonstrated that they were inadequate to achieve the powers which an enlightened and free people should be anxious to achieve—prosperity and national renown, the security of private property, and the security of political rights. And when she became a member of the Union, her people in Convention adopting the Constitution of the United States, they are not to be considered only as delegating to the Government formed by that Constitution, the powers which that Government was authorized to exercise, but they are supposed to have consented to abandon, during all future time, the rights which they had antecedently to pass *ex post facto* laws, to pass bills of attainder, to pass laws impairing the obligation of contracts, to emit bills of credit, to coin money, or to make anything that they might think proper, a tender in payment of debts.

And now, I suppose, my brothers will hardly deny that if Maryland, with a Constitution formed, a Government organized, as it existed in 1789, would have no authority to legislate at all, to interfere in any way whatever, so as to bring about any of the acts against which the section of the Constitution of the United States, to which I have alluded, was aimed; that she can get no such right by resolving herself into her original elements, destroying the Constitution which she had in 1789, and forming another. If that could be done, one of two things would either be the result—that she would be out of the Union, and, of course, not responsible to the Constitution, or in the Union, and equally without responsibility to the section in question. The prohibition, on the contrary, was a prohibition upon the people of the States as they then existed, to remain forever as a restraint vital to the interests of all as well as of each, as long as the Union of States shall endure. Whether, therefore, State legislation against the prohibitions of that Article was attempted by a Legislature organized under the form of Government existing in Mary-

land in 1789, or attempted under any other form, that Maryland might think proper thereafter to adopt—it falls equally within the prohibition, and, if within the prohibition, it was void—not voidable, but void. I had occasion a few days since, to refer your Honors to the 44*th No. of the Federalist*, written by Mr. MADISON, in which he tells us that, although such legislation is void by the Article prohibitory on the powers of the States, and should be considered as void upon principle in every Republican Government, as inconsistent with its objects, because incompatible with the continued existence of political freedom, and it was deemed necessary to adopt that section as a part of the Constitution, that it might remain through all time as a bulwark, around which the people of each State could gather, and hold up any one of them which might be injured—that bulwark as a defence against any attempt to interfere with rights secured as against such legislation by the section.

And how was it to be restrained practically? Who was to decide conclusively that a State had passed, in Convention or by Legislature, an *ex post facto* law—a bill of attainder, or a law impairing the obligation of contracts? Not the State. Not the people constituting the State. The great men of 1789, in the first session of Congress after the Constitution was adopted, passed the Judiciary Act of 1789, in which to make that protection secure as against all hazard, they provided that when, in any State Court, the existing law shall be assailed upon the ground that it conflicted with the Constitution of the United States, and such Court decided that it did not, the party against whom the decision was pronounced, was to have a right to take it to the Supreme Court of the United States, and their decision, once pronounced, was to be conclusive. As these questions, in the first instance, might frequently be brought in the State Courts, they directed that each Judge of every State Tribunal should take an oath to support the Constitution of the United States, and each judiciary therefore became as much bound to regard the prohibitions upon State power,

found in the Constitution, as the Supreme Court itself was bound to see that such prohibitions were not set aside by such State power.

.If, then, the people of.Maryland in 1864, when this Constitution was adopted, were subject to that restraint, can it be denied that they were equally subject to it when the Constitution was adopted—that they are subject to it now, and must remain subject to it as long as they constitute a State of the Union, and the Constitution of the United States exists? The question therefore is: Has or has not Maryland, in the provisions of her present Constitution, violated the Constitution of the United. States? Has she entered upon a sphere of legislation denied to her by her own consent, and denied because, in the judgment of the men of that day, such denial was absolutely necessary to make them what they should desire to be—not only prosperous, but a prosperous because a free people.

The States being antecedently sovereign, and the question being, how far that sovereignty was affected by the Constitution of the United States, and that question depending upon the manner in which the Constitution of the United States had been adopted, whether by the people, in one sense, in the aggregate, or by the. States individually, making it a contract as contradistinguished from a government; whether they had a right, when they thought proper to exert it, to abandon the compact—to retire from the league and to stand upon that antecedent, absolute sovereignty—was a question about which, although there were differences of opinion in the States that did attempt to exert it, the prevailing opinion was that the right existed. The men who have grown up since 1789, and who now, for the most part, constitute the people of the South, if not entirely, who were those engaged in the war, had grown up under the teachings of Jefferson—recognized the world over as the apostle of human freedom—and they had considered those teachings to mean that each State had a right to decide for herself, and conclusively, whether she should

or should not remain in the Union. They had received the doctrine from their fathers, and, above all, they considered it as conclusively established, by the authority of the man to whom the people of the United States and the world are indebted for the Declaration of Rights of 1776, (erroneously as I think,) and now as is almost universally admitted,—a blessed result, which in some measure atones for the misery which the war has brought upon us, South and North,—to have been erroneous.

Let me ask the Court's attention to what the Constitution is, taken by itself, and what the Act of 1865 is, as compared with the authority conferred upon the Legislature by the Constitution. It was adopted at a period of political excitement, not calculated at any time, whatever may be its course, to give reason fair play, and make the obligations imposed by fundamental principles of civil liberty and guaranteed by the Constitution of the United States have their proper influence, and still less calculated because of the cause of the excitement. I am willing to concede that that Convention was governed by what they considered patriotic motives, but it had become embittered against those who held opinions contrary to their own in relation to the rebellion, and were rendered more or less incompetent to submit to the restraints which the Constitution of the United States imposed upon them. They desired, and are entitled to credit for so desiring, to maintain the Government of the United States. They thought it was in imminent peril, and they endeavored, as they thought successfully, to obviate that peril by including certain classes of people, not from participation in the government then of the State, but from participation at any time thereafter. They were not willing to trust to the oath of allegiance—dealing with the present and the future. They sought to exclude all men who at any time, from the beginning of the world to the present day, had spoken or written or acted in any of the particulars found in the clause in the Constitution in question. Had they the authority to do it? Certainly not, if they

have, in doing it, violated the Constitution of the United States. We say they have violated it in two particulars: that the provision is virtually a bill of attainder and an *ex post facto* law. If any one of the voters whose name has been rejected by the registrars, because of his having done any of the prohibited acts in that clause of the Constitution, had been indicted and tried, he could not have been convicted. Is it not, in point of fact, punishment? If the right to participate in the government of the State is vital to the continuance of liberty—if the right to hold office under the State is a valuable right—to be deprived of either, no matter how accomplished, is to be punished.

What is an *ex post facto* law? As simply defined by Chief Justice MARSHALL, in *Fletcher vs. Peck*, 6 *Cranch*, it is any law that makes that punishable which was not punishable before, or which enhances the punishment when a milder punishment existed alone before, or which materially changes the evidence by which the party is to be tried for the crime. The object is to deny to the Legislature the authority at all to interfere in any case which has already existed, to confine them prospectively to the punishment of crimes and their definitions.

In the Act of 1865, the first section provides that the Governor shall appoint, from the citizens of the State, men known for loyalty, firmness and uprightness, to carry out the provisions of the law. I suppose he has done so, but from the manner in which I have heard the duties are discharged by a great many of them, I should hope that he had been able to appoint men of more firmness, more loyalty, and more uprightness.

I don't know that your Honors have been subjected to the moral torture of answering the questions that the registrars are authorized to ask, and been asked whether you had served a term in the penitentiary or not, (I was;) whether you had been convicted of bribery; any and every question these inquisitors might think proper, in the exercise of their inquisitorial power, to propound to the applicant for regis-

tration. Suppose the applicant refuses to answer, our own Constitution says: "No man shall be permitted to criminate himself." The law says, standing upon principles more elevated than any constitutional provision: "No man shall be called upon to degrade himself." Yet if he fails to answer whether he has been convicted or not of any infamous crime; whether, if he has been convicted, his term of punishment has expired or not, or whether he has been pardoned, he cannot vote. If this is not an infliction of punishment, I am at a loss to imagine what punishment is.

Is the petitioner entitled to redress? It is denied—first, upon the ground that what has been done was the legitimate act, as far as power was concerned, of the political department of the Government; second, that whether so or not, the law reposes a discretion in these registrars which cannot be interfered with by *mandamus*. What did *Luther vs. Borden* decide? At that time there were two parties in Rhode Island, each the friends of a different Constitution. There were two Constitutions. Which was the legitimate one? The Court said that was not a judicial question, as it clearly was not. As Rhode Island had decided for herself which was the Government, and Congress had accepted her Senators and Representatives, that was conclusive upon the judicial department of the Government. But that is not this question. We are not denying that the Constitution of 1864 is now the Constitution of Maryland. But we do deny that these particular provisions in the Constitution, as well as the particular provisions in the Act of 1865, are provisions which constitute any part of the Constitution and the law, because when each was adopted there stood, and now stands, in the Constitution of the United States, a positive prohibition against the exercise of any such power, whether by the people in Convention or by Legislature, under any Constitution which that people may have adopted. The question before your Honors is one purely of constitutional law. Does the Constitution of the United States prohibit the enactment by the Legislature of the Act of

71    v.23.

1865? If it does, then there was no power at all. Nor do we question the right of Maryland to call for a registration of voters. My brother seems to suppose the case before you falls within the decision pronounced upon the Act of 1837, a registry law peculiar to the city of Baltimore. But there was nothing in that law which it was not within the power of the Legislature to legislate upon. The only doubt about the validity of that law was that it was local in its operation. It placed the voter in Baltimore upon a different footing from the voter in the rest of the State, and was therefore supposed to be obnoxious to some particular principle in the State Constitution.

If the registrars have no discretion because they have no authority to impose this oath, because of the restraints of the Constitution of the United States, their obligation is to register, notwithstanding the failure to take the oath. Wherever there is a right for which there is no specific legal remedy except by *mandamus*, then that remedy is open to the party.

BARTOL, J., dissented, and filed the following opinion:

The first question presented by the record in this case is, whether the provisions contained in the fourth section of the first Article of our State Constitution are in conflict with the provisions of the Constitution of the United States?

Before proceeding to examine that question, it is necessary to determine whether it is one which this Court has the jurisdiction and power to decide. Looking to the structure and organization of our Government, and to the whole current of authorities, this point seems to me to be free from all possible doubt or difficulty.

The cases that have heretofore arisen, involving the constitutionality of Acts of Congress, or laws of a State, have been decided upon principles and reasons too firmly established to be now disturbed, and are plainly applicable. See *Kent's Commentaries, vol.* 1, 449 to 454, where the cases are collected. On page 453, the author says: "In *Marbury vs.*

*Madison,* 1 *Cranch,* 137, the subject was brought under the consideration of the Supreme Court of the United States, and received a clear and elaborate discussion. The power and duty of the judiciary to disregard an unconstitutional Act of Congress, or of any State Legislature, were declared in an argument approaching to the precision and certainty of a mathematical demonstration."

The principles established by that great case, have been ever since universally recognized and adopted.

"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule; if two laws conflict with each other, the Courts must decide on the operation of each; so if a law be in opposition to the Constitution, if both the Constitution and the law apply to a particular case, so that the Court must either decide that case conformably to the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law, the Court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty." 1 *Cranch,* 177.

Now it requires no argument to show that the same principle must govern Courts of Justice, when they are compelled to decide whether any provision in a State Constitution is repugnant to the Constitution of the United States. This last being the paramount law, if they are repugnant to each other, must prevail. This, in the language of Chief Justice MARSHALL, is "emphatically a judicial question," to be decided by the Courts; it cannot in any sense be called a political question, to be finally determined by the Legislative or Executive Department. Nor is it concluded by the adoption of the Constitution, and the organization under it of the State Government. So to maintain would render nugatory and worthless the limitations upon the powers of the States found in the Constitution of the United States. Those limitations are imposed, not only upon the State Legislatures, but upon the States themselves, and can

no more be transcended or violated by the organic law of a State, than by a law enacted by the Legislature.

To illustrate this, let us suppose that a State were to adopt a Constitution, containing a clause repealing a private charter, or impairing the obligation of any other valid and subsisting contract made either by the State, or between its citizens; would it be for a moment contended, that such a provision would be valid, in the face of the express prohibition contained in the Constitution of the United States, declaring that no *State* shall pass *any* law impairing the obligation of a contract. This point was expressly decided by the Supreme Court in *Dodge vs. Woolsey*, 18 *How.*, 331. The same principle must apply where the case is within any of the other inhibitions upon State legislation, contained in the Constitution of the United States. That Constitution, Art. 1, sec. 10, declares that "no State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." The only part of this section which can apply to the present case, is that which inhibits the passage of any *ex post facto* law. Are the provisions of the 4th section of the 1st Article of the State Constitution *ex post facto*, in the sense in which those words are used in the Constitution of the United States?

This is a most grave and important question, none more so, has ever been presented to the Appellate Court of our State for decision. I have given it as full and careful examination as it has been in my power, and shall proceed to express my opinion upon it, adopting as my guide, the language of Chief Justice BUCHANAN, when dealing with a kindred subject: "It has been said, that a legislative Act should not be pronounced unconstitutional or invalid in a doubtful case; nor should it, where the doubt is *bona fide* and well founded, and not the result of a disinclination to deny the authority of the Legislature, which all must feel, but none should yield to, in violation of a solemn duty. But where a Judge is satisfied, upon full consideration,

that an Act of the Legislature is contrary to the Constitution of the United States, the supreme law, which he is bound to obey, and which must prevail over any Act that comes in conflict, and cannot stand with it, or is for any other reason invalid, he has no choice; and all that is left him, is honestly and fearlessly to do his duty; from the faithful discharge of which, however unpleasant the task, no upright Judge can shrink if he would. On the other hand, a Judge should not suffer himself to be betrayed to pronounce an Act unconstitutional or invalid on insufficient grounds by a morbid apprehension that a contrary decision might be ascribed to the want of a proper sense of judicial duty." *Regent's case*, 9 *Gill*, 383.

It was suggested in the argument, that the Court ought to construe the 4th section, Art. 1 of our Constitution, as operating prospectively from the time of its adoption, and thus avoid the difficulty. Such, no doubt, is the general rule of construction.

In *Baugher vs. Nelson*, 9 *Gill*, 303, which was a case involving the construction of the Act of 1845, ch. 352, the Court, after stating the general rule, said : "But this general principle, salutary and well established as it is, as an element of jurisprudence, can have no application to a case, when the Legislature have declared in language too express and plain to be mistaken, that they designed to give to the Statute in question, a retroactive operation." Here, as in that case, the words are "too plain for dispute, there is no room for construction." It is impossible, therefore, to adopt the construction of this section, suggested in argument, and declare that it is not retroactive in its operation.

But all retroactive laws are not *ex post facto*, in the meaning of the Constitution of the United States. Those words have been declared to have a technical meaning more restricted than their ordinary and common signification. This leads me to inquire what is the true meaning of the term *ex post facto law*, in the Constitution of the United States ?

The cases in the Supreme Court, in which they have come under consideration, are : *Calder & Wife vs. Bull*, 3 *Dall.*, 386. *Fletcher vs. Peck*, 6 *Cranch*, 87. *Satterlee vs. Matthews*, 2 *Peters*, 413. *Watson vs. Mercer*, 8 *Id.*, 88. *Charles River Bridge vs. Warren Bridge*, 11 *Id.*, 423. *Carpenter vs. Com. of Pa.*, 17 *How.*, 456. They have also been considered in many cases arising in the Courts of the different States; among those I have examined are: *Strong vs. Nash*, 1 *Blackf. Ind. Rep.*, 193. ` Lock vs. Dane*, 9 *Mass. Rep.*, 362. *Ross's case*, 2 *Pick.*, 169. *Baugher vs. Nelson*, 9 *Gill*, 229.

These cases do not appear to be in conflict, although different Judges have used different language, in defining the terms *ex post facto*, as used in the Constitution. In *Calder vs. Bull*, Judge CHASE defined an *ex post facto* law to be ;

1st. "Every law that makes an action done before the passing of the law, and which was innocent when done criminal; and punishes such action."

2nd. "Every law that aggravates a crime, or makes it greater than it was when committed."

3rd. "Every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed."

4th. "Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender; all these and similar laws, are manifestly unjust and oppressive."

The other Judges who delivered separate opinions, concurred substantially in the same views; and the subsequent cases have affirmed the same rule of interpretation.

In *Fletcher vs. Peck*, 6 *Cranch*, 138, Chief Justice MARSHALL, defined an *ex post facto* law, as one "which renders an act punishable in a manner in which it was not punishable when committed." He adds, "Such a law may inflict penalties on the person, or may inflict pecuniary penalties which swell the public Treasury."

Anderson *vs.* Baker, *et al.*

Chancellor KENT, 1 *Com.*, 409, after giving Chief Justice MARSHALL'S definition, says: "This definition is distinguished for its comprehensive brevity and precision, and extends to laws passed after the act, and affecting the person by way of punishment of that act, either in his person, or estate. *Ex post facto* laws relate to penal and criminal proceedings, which impose punishment or forfeiture, and not to civil proceedings, which affect private rights retrospectively. Retrospective laws and State laws, divesting vested rights, unless *ex post facto*, or impairing the obligation of contracts, do not fall within the prohibition contained in the Constitution of the United States, however repugnant they may be to the principles of sound legislation. I have quoted thus at length from Chancellor KENT, because I believe he states correctly the result of the various decisions upon this subject.

The same construction is adopted by Judge STORY, 3 *Com. on Const.*, sec. 1339.

It is argued that the provision of our State Constitution under consideration, cannot fall within the definition of an *ex post facto* law, because it relates to the elective franchise, and is intended to fix the qualification of voters; and that being a subject belonging exclusively to the people of the State; the Courts of the United States, have nothing to do with it." There can be no doubt of the soundness of the position, that the States have the sole and exclusive power of regulating the right of suffrage, and of fixing the qualification of voters, and that the Federal Government cannot constitutionally control or interfere with the State in the legitimate exercise of that power; but it by no means follows that the State can, in the exercise of that power, or of any other of her reserved powers, so legislate as to inflict upon the citizen by way of punishment, pains, penalties or forfeiture by law enacted, *ex post facto*, within the prohibition of the 10th section, Art. 1st, of the Constitution of the United States. As well might it be said that, because the State has exclusive jurisdiction over contracts

between her citizens and the remedies for their enforcement, that she can by law or Constitution, deprive the citizen of the protection thrown over him by the Constitution of the United States, which maintains the obligation of the contract inviolate and beyond the power of the States to impair it.

The provision which protects his person and his property from the unjust operation of *ex post facto* laws, is equally comprehensive, and, where it applies, is alike inviolate by the State, no matter by what form of legislation.

By this construction alone, will those provisions in the Constitution of the United States prove, as they were designed, "a bulwark in favor of personal security and private rights?" If then, the provisions of the 4th section, are within the meaning of the Constitution of the United States, an *ex post facto* law, they are not protected from its operation; because they form part of the organic law relating to the right of suffrage. Are they *ex post facto* in the sense and meaning of the Constitution of the United States? They are retroactive, and relate to acts done and words spoken antecedently, before the adoption of the Constitution, and declare that no person who has at any time done the acts or made the declarations therein enumerated, "shall ever be entitled to vote at any election to be held in this State, or to hold any office of honor, profit or trust under the laws of this State, unless, since such unlawful acts, he shall have voluntarily entered into the military service of the United States, and been honorably discharged therefrom, or shall be on the day of election, actually and voluntarily in such service, or unless he shall be restored to his full rights of citizenship by an Act of the General Assembly, passed by two-thirds of all the members elected to each house."

To ascertain the true construction and effect of these provisions, it is necessary to examine the first, third and fifth sections of the same Article, and the seventh Article of the Declaration of Rights, which must be construed with them.

This Article declares, "that the right of the people to participate in the Legislature, is the best security of liberty, and the foundation of all free Government; for this purpose elections ought to be free and frequent, and every free white male citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

The qualifications of a voter are prescribed in the first section, they are: "Every white male citizen of the United States, of the age of twenty-one years or upwards, who shall have resided in the State one year next preceding the election, and six months in any county or legislative district of Baltimore city, and who shall comply with the provisions of this Article of the Constitution, shall be entitled to vote at all elections hereafter held in this State."

The 3rd, 4th and 5th sections, declare the causes of disqualification, or causes for which the citizen forfeits the right of suffrage. With the exception of lunatics, or persons *non compos mentis*, who are incapable of doing any valid civil Act, and are therefore excluded, all the causes of disqualification named in the 3rd, 4th and 5th sections, are either for offences before known to the law, or so declared by the Constitution.

By the 3rd section, persons convicted of larceny or other infamous crime, unless pardoned by the Governor, are disqualified. Here, disfranchisement is a punishment consequent upon conviction; this provision is prospective only in its operation.

By the 5th section, persons convicted of bribery at elections and other offences therein enumerated, are in addition to the penalties imposed by law, disqualified from voting or holding office.

By the 4th section, persons who have *at any time done* the acts, or made the declarations therein enumerated,— some of them being offences against the United States, and some of them, to wit: words spoken and desires expressed,— not offences known to the law before the adoption of the Constitution, and which are therein for the first time, declared

72      v. 23.

to be unlawful, are punished with disfranchisement. It is said, that disfranchisement, under the 4th section, is not intended as punishment. But in the Constitution itself, in the 5th section, disfranchisement is expressly declared to be punishment. How then, can it be said, that in the 4th section, where the same consequence is denounced against the persons who have committed the unlawful acts therein enumerated, can the disfranchisement be construed not to be punishment.

This, then, is in the nature of a criminal enactment, for it declares certain acts to be unlawful, and provides, as a consequence of their commission, that the offender shall be disfranchised. The criminal character of the provision would scarcely be disputed, if the Constitution provided in terms that the offence should be evidenced as the case of larceny and bribery, by conviction in a Court of justice. But it cannot change the penal character of the enactment, if the law-making power fails to secure to the accused the safeguard and protection of a trial according to the law of the land.

If I am right in this construction, then the 4th section is an *ex post facto* law, within the strictest definition of those terms; and therefore within the inhibition of the Constitution of the United States.

The next question to be examined is, whether the provisions of the Act of 1865, ch. 174, entitled, an Act for the registration of the voters of the State, are in conformity with the Bill of Rights and Constitution of Maryland? This question will be considered apart from any objections to the provisions of the Constitution, and assuming them to be in all respects valid.

It is contended that the Act is null and void, because it is not "enacted in articles and sections, in the same manner as the Code is arranged," as directed by section 28 of Art. 3 of the Constitution. It is plain, upon an inspection of the Act, that this direction has not been complied with; it is passed in the ancient form used and practiced before the

Code was adopted. The 28th section of the 3rd Article contemplates and directs that the law, in its body and form, shall be codified by the Legislature in passing it; such has been the uniform construction of that section, and the practice under it since the Code was adopted. The provision is the same as was contained in the Constitution of 1851. In this respect the Legislature have failed to observe the directions of the Constitution.

The Act passed at the same session, ch. 159, does not, in my opinion, remove the objection. That Act does no more than declare the purpose of the Legislature with regard to laws thereafter to be enacted on the subject of registration, but does not in fact codify them. I do not think, however, that this omission renders the Act void. The provision of the Constitution, in this respect, is directory merely; and although a compliance with it would promote the public convenience, and carry out the policy of the State, by maintaining uniformity in the Code embodying the general statute law; yet, looking upon the words of the Constitution as directory only, and relating to form rather than substance, a failure to comply with the form prescribed, would not, either upon reason or authority, render the Act null.

Far more grave and serious, and, in my opinion, fatal objections to the Registration Act now under consideration, present themselves when its several provisions are examined and brought to the test of those vital and fundamental principles embodied in our Declaration of Rights, which form part of our organic law, and are designed as restraints upon the powers of the Legislature, as well as of the other departments of the Government, and which are, in the language of Chancellor KENT, "part of the muniments of freemen, showing their title to protection." 2 Kent, 8.

The provisions of the Registration Law are, in my opinion, repugnant to the Declaration of Rights of 1864, and are not authorized or sanctioned by the Constitution of Maryland. The Bill of Rights and the Constitution form one instrument, and are to be construed together. So far as this question is concerned, they are not in conflict.

The plain construction of the 1st, 2nd, 3rd, 4th and 5th sections of the 1st Article of the Constitution, and the 7th Article of the Bill of Rights, is, that the right of suffrage is secured to every white male citizen of the United States, of the age of twenty-one years or upwards, and having the requisite residence, unless for some of the causes enumerated in the 3rd, 4th or 5th sections, he is disqualified, or that right has been forfeited. Of course I do not hold that the right of suffrage is a natural or inherent right, existing independently of the organic law. For the purposes of this question, I treat it as a right to be exercised only in conformity with the organic law ; but where it exists, it is a most valuable right, entitled to the same protection as the right to any property or franchise. Where the qualifications enumerated in the 1st section exist, the right of suffrage is conferred upon the citizen, and to deprive him of that right, the cause of disqualification must be shown.

By the 2nd section of the 1st Article, and the 41st section of the 3rd Article, it is made the duty of the Legislature to pass laws for the registration of voters. How is that power to be exercised? The Constitution does not prescribe the mode, further than to require that it shall be done by law. Here the subject is left to be dealt with by the Legislature in the same manner as they may deal with any other subject confided by the Constitution to their authority, and to be regulated by law, passed in subordination to the restraints upon the legislative will, imposed by the Declaration of Rights, and in such manner as that the citizen shall not be deprived of those securities for his protection, guaranteed to him by the organic law, and of which the Legislature cannot constitutionally deprive him.

By the Registration Act, the Legislature has conferred upon the officers of registration the most extraordinary and despotic powers, which are thus briefly but correctly stated in the appellant's brief:

1. They have the power of summoning witnesses to prove the qualification of voters, and are invested with judicial

functions, the same as a Judge of a Circuit Court, for the purpose of issuing summons, attachments and commitments.

2. They are authorized to pronounce judgment against any citizen for acts committed within or without the jurisdiction of Maryland, which amounts to a forfeiture of his right to vote.

3. They are not required to give any notice of the charges to the accused party, or to confront him with witnesses, or to try him by jury, or to keep any written record of the trial.

4. They are only required to record his conviction in these words, "disqualified for disloyalty under Article 1 of the Constitution."

5. The ordinary rules of evidence are disregarded; the guilt of parties accused of treason and bribery, is permitted to be proved without trial or conviction by a competent Court; a party is required to testify against himself, particularly by section five, wherein the registrars are directed to exact an oath from the citizen to answer any questions touching his right of voting, and this even when his oath may be discredited.

6. The judgment of the registrars disfranchises the citizen forever, unless discharged by a two-thirds vote of the General Assembly.

It seems to me that the Act is in plain conflict with the 2nd Article of the Bill of Rights, by depriving the citizen of the benefit of "the common law, and the trial by jury, according to the course of that law." 2nd. With Article 20, which declares that the trial of facts when they arise, is one of the greatest securities of the lives, liberties and estate of the people. And especially with Article 23, which declares "that no man ought to be taken or imprisoned, or disseised of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the law of the land."

These words, "law of the land," first used in *Magna Charta,* have been universally interpreted to mean "law in its regular course of administration through Courts of Justice." See *Coke's Inst.*, 45, 50. 2 *Kent*, 13. *Story on Const.*, 661.

In 9 *G. & J.*, 412, Chief Justice BUCHANAN said these provisions in the Bill of Rights "were intended as restraints upon the legislative power, by means of Courts of Justice, in which the laws were to be administered, and where all would be entitled to be heard, and have an opportunity afforded them of asserting and defending their rights against any attempted invasion." See 2 *Md. Rep.*, 452. 1 *Md. Ch. Dec.*, 252. 3 *Kern.*, (*N. Y.*,) 394, &c.

In 4 *Hill*, 145, Chief Justice BRONSON, speaking of the provision in the Constitution of New York, said: "The words law of the land, as here used, do not mean a statute passed for the purpose of working the wrong;" and again, "the meaning of the section then seems to be, that no member of the State shall be disfranchised of any of his rights and privileges, unless the matter be adjudged against him upon trial had according to the course of the common law."

The Registration Act, by making the decision of the registrars final, and failing to provide any appeal or other mode by which the right of the citizen to his franchise might be tried and determined in due course of law, deprives him of the protection of this great provision in our Bill of Rights. The powers conferred by this Act upon the registrars, are wholly dissimilar from those heretofore held and exercised by judges of election in this State, and no analogy can properly be drawn between them; nor, does it seem to me, is any precedent furnished by our past legislation for conferring upon subordinate tribunals, created by the Legislature, such extraordinary and absolute judicial powers. The provisions of the Constitution do not, in express terms, authorize the Legislature to confer such powers on the registrars, and such authority cannot be implied in

the face of the express prohibitions of the Declaration of Rights.

Believing the provisions of the Registration Act to be plainly repugnant to the Declaration of Rights, I think it ought to be declared inoperative, and that the writ of *mandamus* prayed for by the appellant ought, for that reason, to be refused.

GOLDSBOROUGH, J.

Without expressing my views *seriatim* upon the important questions involved in this case, I am content to unite with the majority of the Court in affirming the order of the Court below, for the reasons assigned by my brothers, BOWIE, COCHRAN and WEISEL, in their respective opinions.

COCHRAN, J., concurred in the decision of the majority of the Court, and filed the following separate opinion:

The appellant, in his petition for a *mandamus* in this case, alleges that he is, and for many years past has been, a citizen of Maryland, residing in the fourth election district of Montgomery county; that, until now, he has there possessed and exercised the right of suffrage without hindrance or question, and that he has done no act by which any of his rights as a citizen could be justly forfeited or impaired; he also alleges that, under the supposed authority of the 1st Article of the Constitution, and of the Act of 1865, ch. 174, the appellees were appointed to register the voters of his election district; that he duly appeared before them and demanded that he should be unconditionally registered as a legal voter, and that they refused so to do. He then charges, in support of his alleged right to unconditional registration, that the provisions of the Constitution and Act above mentioned, in so far as they prescribe the oath to be administered to persons applying for registration as a condition of the right to be registered, are *ex post facto* laws, within the meaning of the 10th section of Article 1 of the Federal Constitution, and therefore void.

This proposition, with others of a subordinate character, going to the consistency of the Registration Act with the Bill of Rights and Constitution of the State, were fully and ably discussed in the argument of the case; and it must be conceded that they present questions of the utmost delicacy and importance. Involving, as they do, the right of a considerable portion of our citizens to the continuance of a privilege heretofore enjoyed, and consequently tending to excite the public mind, it is, perhaps, to be regretted, that their adjudication is required at a time when the judgment to be pronounced may fail to command impartial consideration. This, however, is a result with which we have nothing to do. Our duty in the premises is a plain one, and that is, to declare, without fear or favor, the law as we find it.

That the question as to the conflict of the State Constitution with that of the United States, is wholly judicial in its nature, and one that this Court has jurisdiction and power to decide, is scarcely the subject of a doubt. It was not contended, nor does it appear to be distinguishable in principle from the like question of repugnancy on a legislative Act, which the State Courts are required to hear and determine. The Constitution of the United States, as the Supreme law of the land, is binding on the governmental power, as well as on the people of the several States; and the 10th section of Article 1, declaring that no State "shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts," is an inhibition operating as directly and with as much force upon the original lawmaking power of the States residing in the people, as upon that power when delegated to the Legislative Department of a State government. In this view the State Constitution, although an organic Act of the people, is none the less a law within the meaning and restrictive purpose of this section of the Federal Constitution. To hold otherwise, would be to strike down a bulwark interposed for the protection of the citizen by the supreme law of the land,

and open a door to the very mischiefs it was intended to guard against and prevent.

Treating, then, the important question here presented as one properly within our jurisdiction, some of the principles recognized as elemental in our system of State government, must be taken into consideration. That the States are sovereign within the limitations imposed by the Federal Constitution, and that this sovereignty resides in the body of the people of the several States, is not denied; nor is their power to reform or abolish their existing State governments and establish new ones, within the above mentioned limitation, open to question. In the exercise of this power, they may ordain and establish the form of government in their judgment best adapted to their wants, condition and interests; they may prescribe the offices necessary to its administration, and declare the qualifications of the officers, as well as define the nature and extent of their authority and duty; and to the end that the government ordained may be permanent, and still admit of administration with the force and according to the varying condition and sense of the people, they can provide for vacating and filling the offices at stated intervals by elections, and, as a necessary incident of this power, clothe the citizens, or any class of them, with the elective franchise. In brief, the people, in their original sovereign character, are the fountain head of governmental authority, and all the powers necessary to be exercised in the continued administration of a representative government, originate in and are delegated by an exertion of their sovereign will. These propositions, founded in necessity, and illustrated by long continued practice, have become the received doctrines of the American people,—in fact, axioms in the civil polity of the several States; and as doctrines firmly and finally established by universal consent, they are thus generally stated, that we may proceed with a more definite understanding of the nature of the right in question. It will be necessary, however, to show that the conclusions we have reached are consistent with

these fundamental principles, that a closer examination of this right should be had.

As we have seen, the right of suffrage is bestowed on the citizens as a necessary element in every representative Government, to the end, that the Government ordained, may be perpetual and permanent, and the purposes contemplated by its establishment, more effectually accomplished. "The right of voting," says STORY, in his *Commentaries on the Constitution, sec.* 580, "like many other rights, which, whether it has any fixed foundation in natural law or not, has always been treated in the practice of nations, as a strictly civil right, derived from and regulated by each society according to its own circumstances and interests." With us, the privilege appears to be altogether conventional and derivative, and not original or inherent in the citizens. Prescribed by the people in the exercise of their organic power, for the purpose of giving effect to their expressed will, it is impossible, in the nature of things, that it should exist, or have an existence independent of that will. It is held to be a privilege, conferable by the people for sovereign purposes on a greater or less number of citizens, and the power to confer it for purposes that they may change at pleasure, necessarily implies power to withdraw or suspend it. But this is not all. The people, in clothing a citizen with the elective franchise, for the purpose of securing a consistent and perpetual administration of the Government they ordain, charge him with the performance of a duty in the nature of a public trust, and in that respect, constitute him a representative of the whole people. This duty requires that the privilege thus bestowed, should be exercised, not exclusively for the benefit of the citizen, or class of citizens professing it, but in good faith, and with an intelligent zeal for the general benefit and welfare of the State. It is on that ground that the corruption of the privilege by bribery, is denounced as a crime; and that adherents to a public enemy, conspirators against established authority, and felons are held to be

unfit, and unsafe depositaries of a privilege, the disinterested, honest and faithful exercise of which is so vital to the preservation of public justice and tranquility. In no case, so far as we have learned, has the right of suffrage ever been conferred on all the citizens of any State. In many of them, the qualifications prescribed for its exercise, are such, that large numbers of the citizens are altogether excluded from its enjoyment, while in others, the privilege, where once conferred, has been withdrawn and bestowed on citizens not before possessed of it. By the first Constitution of this State, adopted in 1776, the right of suffrage was limited to all free men, without regard to color, above the age of twenty-one years, having a freehold of fifty acres in the county of the voter's residence, and to all freemen having property in the State, above the value of thirty pounds current money."

In 1802, a radical change was made in this provision of the organic law by an amendment, which declared, " *that every white male citizen of this State, and no other, above the age of twenty-one years,*" having resided, &c., should "*have a right of suffrage.*" It is unnecessary, however, to multiply illustrations of this exercise of the sovereign power of the States. In this particular it is sufficient, for our present purpose, to show that the elective franchise, as a privilege of the citizen, is a matter, of which, the people of the State have the absolute control. That this right or power of the people of the several States, is neither abridged nor interfered with by the Constitution of the United States, seems never to have been questioned, but, on the contrary, to have been affirmed by a necessary implication from the provision in the 2nd sec. of Art. 1, declaring that the electors of representatives in each State, "shall have the qualifications requisite for electors of the most numerous branch of the State Legislature." To recapitulate then, the substance of what has already been said, for the purpose of concluding on this branch of the present inquiry, I find : 1st. That the elective franchise, within the purview of

this case, is a privilege conferred on the citizen by the sovereign power of the State to subserve a general public purpose, and not for private or individual advantage; that, as against the power conferring it, the citizen acquires no indefeasable right to its continuance or enjoyment; and that the people of the State, in the exercise of their sovereign power, may qualify, suspend, or entirely withdraw it from any citizen or class of them, providing always, that representation of the people, the essential characteristic of a Republican Government, be not disregarded nor abandoned; and, 2nd. That the right and power of the people to qualify, suspend, or entirely withdraw this privilege, is an inherent condition of its enjoyment, impressed upon, and following it from the time of its bestowal on the citizen.

Let us now examine the provisions of the State Constitution, upon which the main question here is raised.

The 7th sec. of the Bill of Rights declares, that " every free white male citizen, having the qualifications prescribed in the Constitution, ought to have the right to vote," and the 1st, 3rd, 4th and 5th secs. of Art. 1 of the Constitution prescribe these qualifications.

The 1st of these secs. provides, that every free white male citizen above the age of twenty-one years, who shall have resided one year in the State, and six months in any county or election district of Baltimore city, and who shall comply with the provisions of this Art., shall have the right to vote; the 3rd declares, that no person, lunatic or *non compos mentis*, or person convicted of any infamous crime, unless pardoned by the Governor, shall have the right to vote; the 4th, that no person who has been in armed hostility to the United States, or who has been in the service of the so called Confederate States, or who has in any manner by word, act or deed, given them aid, comfort or countenance, or declared his adhesion to them, or expressed a desire for their triumph, shall have the right to vote; and the 5th, that no person who, since the 4th of July 1851, has been or shall be convicted in a Court of Law of

bribery, or of resorting to force, fraud, or surprise, to cor-
rupt or defeat the exercise of the right of suffrage, shall
thereafter be entitled to vote, or hold any office of profit or
trust.

To ascertain the class of persons to whom the privilege
of voting is extended by these provisions, it is necessary to
consider and construe them as a whole, according to the
ordinary meaning and sense of the terms used, and so as to
effect their intended purpose. The rule of construction in
such cases, is well stated in *Manly vs. State*, 7 *Md. Rep.*,
135, where it was said, that "Constitutions are not to be
construed according to words used in particular clauses,
but the whole must be considered."

We find, then, by the true construction of these provi-
sions, that the right of suffrage is bestowed upon such per-
sons only, as are within the description of the 1st sec., and
not within the exceptions contained in the 3rd, 4th and 5th
sections; and by necessary implication, that the right has
been withdrawn from, and denied to all persons within these
exceptions, and not within the description of the 1st sec.

The question to be considered is raised upon the 4th sec.,
which suspends or withdraws the right or privilege of vot-
ing from a portion of the citizens for deeds done, and words
spoken before the Constitution was adopted, and it is objec-
ted to on that ground as retrospective and *ex post facto*,
within the meaning of sec. 10, Art. 1 of the Federal Con-
stitution.

In my opinion, there are two replies to this objection,
either of which is conclusive. The first requires that we
should ascertain the true force and meaning of the term *ex
post facto*, as used in the Constitution of the United States.
We have carefully examined the cases in which this term
has been considered, and its scope and purpose limited and
defined. In *Calder & Wife vs. Bull*, 3 *Dall.*, 386, where
the question here was pressed upon the Court, CHASE, Jus-
tice, defined an *ex post facto* law to be:

1st, Every law that makes an action done before the

passing of the law, and which was *innocent* when done, criminal.

2nd. Every law that *aggravates* a crime, or makes it *greater* than it was when committed.

3rd. Every law that *changes the punishment*, and inflicts a *greater punishment* than the law annexed to the crime when committed.

4th. Every law that alters the *legal* rules of *evidence*, and receives less or different testimony than the law required at the time of the commission of the offence, *in order to convict the offender*.

He says, further, that "every *ex post facto* law must be retrospective, but that every retrospective law is not *ex post facto*." In *Fletcher vs. Peck*, 6 *Cranch*, 138, MARSHALL, Chief Justice, said, than an *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when committed; and Chancellor KENT, in *Vol. 1st* of his *Com.*, *p.* 451, in reviewing these cases, says, that the definition of an *ex post facto* law, given in *Fletcher vs. Peck*, "is distinguished for its comprehensive brevity and precision, and it extends to laws passed after the act, and affecting a person by way of punishment of that act, either in his person or estate. *Ex post facto* laws relate to criminal and penal proceedings, which impose punishments or forfeitures, and not to civil proceedings which affect private rights retrospectively. Retrospective laws and State laws, divesting vested rights, unless *ex post facto* or impairing the obligation of contracts, do not fall within the prohibition contained in the Constitution of the United States, however repugnant they may be to the principles of sound legislation."

Accepting then, as we are bound to do, this exposition of the character and office of the term *ex post facto*, as used in the Federal Constitution, we have next to inquire whether the suspension of the right to vote for the reasons stated in the 4th section of Article 1, is a punishment, within the meaning of that term, inflicted upon the persons whose

right or privilege of voting is suspended. To be a punishment, as contradistinguished from a mere personal inconvenience or loss of a privilege, it must be found that it was so intended; but if it be found, on the other hand, that the distinctive purpose of the section in question was altogether foreign to the criminal status of the citizen, and that the privilege of voting was qualified or withdrawn as an incident only of that purpose, then the provisions therein contained cannot be construed as penal, or be held open to any objection on that ground. In ascertaining, therefore, the purpose of the provision, we shall answer the inquiry propounded here.

The sections of Article 1, to which we have referred, all relate to the right of suffrage, and were intended to fix, limit and qualify, the possession and exercise of it. As a part of the Constitution, they vest and regulate the exercise of a privilege essential in its nature to the permanency and consistent administration of the government it establishes; and that this privilege was dealt with in these sections with express reference to that purpose, and no other, would scarcely seem to be the subject of a doubt. The end proposed by the Constitution, was the establishment of a new government, and the class and qualifications of the citizens who, by the right of suffrage, were to be clothed with the power of controlling and administering it, were, as they now stand in the Constitution, the first and most important of the matters for consideration. It must be presumed, from the nature of the subject, that the framers of the Constitution, as well as the people who adopted it, intended, by the several provisions contained in these sections, to secure not only the stability of the government, but to guard against an inconsistent or perverted administration of it. With that view, and in furtherance of that purpose, the privilege of voting was withheld from a class of citizens presumptively unfitted to exercise it. It is denied to the lunatic or person *non compos mentis*, because of his incapacity to understand or perform the duties of a citizen; it is withdrawn

from the person convicted of infamous crime, for want of the integrity necessary to guard against a fraudulent use or abuse of it; and from the person who has been in armed hostility to the United States, or has adhered to their enemies, on the ground of hostility to the State, as an integral part of the Union. Even the 5th section, which may be said to contemplate in some qualified sense, an increase or addition to the penalties of bribery, looks more to the limitation of the privilege to proper persons, than to the punishment of the offender. No such doubt arises, however, in regard to the scope and meaning of the 4th section, which discloses a purpose so far disconnected from and foreign to the criminal status of the citizen affected, as to bar any inference that punishment, as such, was intended.

But, as I have intimated, there is another reason why the objection made to this section cannot be maintained. We have found that the elective franchise is conferred on the citizen by the sovereign power of the State, to subserve a public general purpose; that, as against the sovereign power, the citizen acquires no indefeasable right, and that the right of the people to qualify, suspend or entirely withdraw the privilege, is one of its inherent conditions, impressed upon and following it from the people to the citizen. If this exposition of the nature of the privilege be the true one, it is impossible for this section to be *ex post facto* or retrospective, in the strict sense of those terms. The suspension of the privilege, no matter upon what pretext, is authorized by this inherent condition, subject to which the citizen holds it; and if it can be suspended without regard to the conduct of the citizen, certainly no deed or word done or spoken by him, could subject that power to any limitation or restriction. The condition of the privilege, as between the people and the citizen, takes it altogether out of the range of *ex post facto* legislation; and it is not too much to add that the constitutional inhibition against *ex post facto* laws, if it could be successfully invoked in aid of the citizen in such a case as this, would become an in-

strument for converting a conditional privilege into a vested right, as well as for disarming the people of a power essential to the safe management and control of their domestic affairs. Upon this expression of my views, I conclude that the 4th section of Article 1 of the State Constitution does not conflict with the provisions of section 10 of Article 1 of the Constitution of the United States.

In the course of the argument, other propositions were discussed, which do not appear to have been specifically presented in the appellant's petition, as reasons for granting his prayer. Two of them have a material bearing upon the final disposition of the case, and for that reason should be decided here. One is, that the Act of 1865, ch. 174, was not enacted in articles and sections, according to the requirements of section 28, Article 3 of the Constitution; and the other, that even if consistent with the Constitution, it is still invalid, on the ground that it conflicts with the 22nd and 23rd sections of the Declaration of Rights. Neither of these propositions requires an extended notice. This Act is to be read in connection with another, passed at the same session, ch. 159, which provides for the incorporation of a new Article in the Code, under the title "Registration;" and an inspection of them both has gone far to satisfy me that the requirements of the Constitution have been fully complied with. But assuming, without however so deciding, that the Act was not passed in strict conformity with those requirements, still the failure to comply with them would not be a sufficient reason for declaring the Act void. Amongst other things, the 28th section of Article 3 provides, whenever any general public law shall be passed, not amendatory of any section or Article of the Code, "that it shall be the duty of the General Assembly to enact the same in Articles and sections, in the same manner as the said Code is arranged." This provision is plainly not mandatory, but directory,—a mere instruction to the Legislature as to the form in which laws should be passed, and having reference only to the public convenience. It relates

74    v.23.

altogether to a matter of form, and not to substance, and a failure to pursue the directions as to form, would scarcely have the effect of defeating a solemn legislative Act, otherwise free from objection.   This section was in the Constitution of 1851, and the question is not presented now for the first time.   The effect upon a legislative Act of not strictly complying with the requirements of another clause like in character to the one before us, was considered in *Davis vs. State,* 7 *Md. Rep.,* 159, 160; *Keller vs. State,* 11 *Md. Rep.,* 531; and in *Parkinson vs. State,* 14 *Md. Rep.,* 193; in all of which views were expressed confirming the conclusion stated here.

The remaining proposition presents a more complex, though not more difficult, question.   The General Assembly is required, by section 2, Article 1 of the Constitution, to provide by law for a uniform registration of the voters, which registration it declares shall be evidence of their qualification to vote; reserving to the citizen however, otherwise qualified, the right of voting until such law should be passed and carried into effect.   The 4th section requires the judges of election and officers of registration carefully to exclude all disqualified persons from voting and registration; it then provides for the administration by them of an oath, the form of which is therein prescribed, to persons offering to vote or presenting themselves for registration, and directs them to exclude from voting or registration, as the case may be, any person declining to take this oath. Section 41, of Article 3, also requires the General Assembly "to pass laws for preserving the purity of elections by the registration of voters, and by such other *means as may be deemed expedient,* and to make effective the provisions of the Constitution disfranchising certain persons, or disqualifying them from holding office."

It is necessary, in this connection, to repeat in more exact terms what has already been said in substance, and that is, that by the 1st, 3rd, 4th and 5th sections of this Article, the privilege of voting is given only to white male citizens, pos-

Anderson *vs.* Baker, *et al.*

sessed of legal capacity, and above twenty-one years of age, who have resided twelve months in the State and six months in any election district or precinct, and have not, by word or deed, adhered to the enemies of the United States, nor been convicted of bribery or infamous crime. To the citizens so described, and to them alone, is the right of suffrage given. The privilege, however, is still further qualified, as we have seen, by another limitation, and that is, that the citizen shall take the oath prescribed in the 4th section, which further declares that the person declining to take it, shall be excluded from voting and from registration, and that registration, after a law for registration has been passed and carried into effect, shall be the evidence of the right to vote, and without which no citizen is to be allowed to vote. It is also said in this section, that taking the oath shall not be deemed conclusive evidence of the right to vote. These provisions are specific and affirmative, and their purpose is too clear, direct and positive to admit of misapprehension or doubt. They require the General Assembly to pass such laws for the registration of voters as *they may deem expedient* to carry into effect these disfranchising clauses; and in declaring it to be the duty of the officers of registration carefully to exclude from registration all disqualified persons, they create the agency and confer upon it exclusive jurisdiction and power to determine finally and in full all questions as to qualification and right to registration. The duty of carefully excluding all disqualified persons from registration, is a special, limited and exclusive duty, involving an exercise of judgment and discretion altogether beyond the supervisory and restraining power of any other tribunal or department of the government. Whether it was consistent with sound public policy to clothe the officers of registration with a power thus beyond judicial control, is altogether foreign to the present inquiry; it is enough to find that the people have expressly conferred it by the terms of their organic law.

This view of these provisions, and of the powers they confer, leads us to the question of their conflict with the Declaration of Rights. That instrument is to be taken as a part of the Constitution. It declares not only doctrines relating to and confirmatory of personal rights, but principles to be regarded in administering the Government; like the Constitution, it was the immediate work of the people acting in their sovereign capacity, and, with the Constitution, was intended to prescribe the form and powers of the Government. Each has its office; one is general, the other is particular; and taken together, resort may be had to either, to ascertain the meaning and effect of the other. That the Declaration of Rights furnishes a guide for the construction of ambiguous provisions of the Constitution, as well as a test of the validity of laws not specifically required by the Constitution, and otherwise free from objection, is conceded; but if the Constitution differs in any of its provisions with the general doctrines or principles set forth in the Declaration of Rights, such provisions are to be regarded as limitations or qualifications of those general doctrines or principles, and allowed to have effect accordingly. *Crane vs. Meginnis,* 1 *G. & J.,* 476. *Police case,* 15 *Md. Rep.,* 376. And so here, if the constitutional provisions, to which we have referred, are found to be inconsistent with any doctrine or principle contained in the Declaration of Rights, they are not to be defeated and pronounced void on that ground, but taken as exceptions to, or qualifications of, those doctrines or principles. If, then, the provisions contained in that portion of the organic law, have no effect in the way of limiting or qualifying any express provision of the Constitution, it is clear that they cannot be invoked for the purpose of setting aside any portion of the Act of 1865, unless, indeed, it be found that the Legislature, in passing it, has exceeded the express or necessarily implied requirements of the Constitution. It is insisted, however, that this was done, and the specific objections made to the Act in that connection, are, that it

imposes on the citizen, offering himself for registration, the duty of taking an oath to answer interrogatories by which he may criminate himself; that it allows convictions of infamous crimes to be proved, not alone by the record of the conviction, but by witnesses; and that it authorises the disseizin of the voting privilege, otherwise than by due course of law. The second of these objections, seems to me to be wholly destitute of foundation. It relates to the measure of proof required by the Act, to show the fact of conviction. According to the established rules of evidence, the record of the conviction would undoubtedly be the best, and, therefore, the only admissible evidence of that fact; but it is impossible to maintain the doctrine in cases where the purpose is not to punish an antecedent crime, that the Legislature was without power to change the rule and prescribe a different one. In this case, the fact of conviction is treated by the Legislature, as one to be proved by witnesses, as well as by the record; and that they had the discretion and power so to treat it, I do not entertain a doubt. The soundness of the other objections must be tested by the express and necessarily implied requirements of the Constitution in regard to registration.

The officers of registration are directed by the 4th sec. of Art. 1st, to "*carefully exclude from registration, all disqualified persons;*" and, to secure a uniform performance of that duty, it was absolutely necessary to fix and prescribe, the mode by which they should be able to investigate and decide upon each case. The same section also required an oath to be administered, the taking of which, it declares, was "*not to be deemed conclusive evidence of the right to vote,*" thereby necessarily implying power and duty, in the officers of registration, to make further examination. To meet and satisfy this plain requirement of the Constitution, the Act of 1865 was so framed, as to authorise the administration of a further oath to answer such questions as the officers of registration should propound. The mode of further examination, thus prescribed, is not only a compliance

with a well defined requirement of the Constitution, but it is strictly consistent with the nature of the duty which it declares the officers of registration should perform. No citizen is compelled to undergo the examination thus proposed; the administration of the oath is made a condition of his right to registration, and, by the Constitution, he could not acquire the right to be registered as a voter, even if then, without subjecting himself to this condition. If crimination, either as to crime or disloyalty, be the result of answering questions touching the right to registration, it is clear, that in such cases the right to vote is denied by the Constitution, and that no wrong is done by the provisions of the Act. But this is not all. The proposition in the Bill of Rights, by which this objection was sought to be supported, is, " that no man ought to be compelled to give evidence against himself in a criminal case." The proceedings authorised by the Registration Act, are not criminal in their nature or purpose. The citizen is not arraigned nor called to answer, except at his own election, and then, only to enable the officers of registration to ascertain, whether he has the qualifications, made necessary by the Constitution, to his registration as a legal voter. The oath provided for here, certainly does not fall within the inhibition of the Bill of Rights, whether required by the Constitution or not. The answer to the remaining objection has already been substantially presented. Assuming that the privilege of voting was contemplated by the 23rd section of the Declaration of Rights, as one of which the citizen should not be disseized, otherwise than by due course of law, still we have found that the Constitution provided for ascertaining by a registration of the voters, to whom the privilege of voting was extended, and that it clothed the officers, charged with this duty, to the exclusion of Courts and juries, with full power and jurisdiction to hear and finally determine all questions as to the right of voting and registration. To this extent, and that is as far as the objection can go here, the voting privilege was withdrawn

or excepted from the operation and protection of this section of the Declaration of Rights, by the express provisions of the Constitution.

This seems to me to be a sufficient review of the material questions raised upon this record, and, for the reasons here stated, I conclude, without further comment, that the order of the Court below should be affirmed, with costs to the appellees.

WEISEL, J., concurred in the decision of the majority of the Court, and filed the following separate opinion:

The appeal in this case is from an order of the Circuit Court for Montgomery county, dismissing the petition of the appellant for the writ of *mandamus*, which he prayed might be directed to the appellees, officers of registration of voters for the fourth election district of said county, commanding them to register his name on the column of legal voters in said district and county.

The petition seemingly expresses doubts about the adoption of the Constitution of Maryland of 1864, but as the petitioner sought the interference of the Court below in order to afford him the benefit of a law passed under its authority, we may presume that he did not seriously question its existence as the organic law of Maryland. Such a question could not now be raised or entertained. The adoption and valid existence of the present Constitution of Maryland are settled beyond inquiry, and were so treated in the argument.

Nor is it pretended, upon this application, that the law of 1865, ch. 174, for the registration of the voters of the State, is wholly void, as being in conflict with the Constitution of the United States, or the Constitution of Maryland. If void *in toto*, the appellees would have no authority to register any vote, and the Court could not be invoked to order an illegal act. The petitioner, in that case, would be insisting upon an act to be done under a void law. So much therefore of the argument as was directed against the law, on the ground that it was not enacted in articles

and sections, as the Code is arranged, (Constitution, Art. 3, sec. 28,) and for that reason it should be regarded as void, does not belong to this case, and was not prompted by any thing contained in the petition of the appellant for the writ of *mandamus.*

The petitioner claimed to have his name registered in the column of qualified voters, without taking the oath prescribed by said law, or being further subjected to examination under oath touching his qualifications and right to vote. These requirements of the law he denounced, in the paper which he presented as containing his reasons for refusing to take said oath, as despotic, as usurpations, as unwarranted by the principles of free government, and as in conflict with the letter and spirit of the Federal Constitution, in certain of its provisions. He refused to comply with these requirements. The answers of the appellees also state the same fact of refusal.

The petitioner, therefore, while he admits generally the validity of the Registration Act, and seeks to register under it, alleges the unconstitutionality of so much of the 1st Article of the Constitution of Maryland, and the provisions of said Act of Assembly agreeing therewith, as require the officers of registration to exact the oath and to institute the examination aforesaid, he avowing that he is a white male citizen of the United States, above the age of twenty-one years, having the required residence, and as having heretofore, without hindrance, exercised the right of suffrage, which he has done nothing to forfeit or impair.

It is conceded that if there is any thing in the registration law of 1865, or of the Constitution of Maryland, authorising its passage, violative of any provision of the Constitution of the United States, or in conflict with any of its prohibitions upon the States, such parts of the law and Constitution are void and of no effect, the Constitution of the United States being the supreme law of the land, and binding upon conventions and people in forming and adopting State Constitutions, as well as upon the Legislatures of

the States in the enactment of laws. If there is, therefore, any portion of the Constitution of this State, or of the registration law passed at the last session of its Legislature, clearly obnoxious to the objection that it is in conflict with that instrument, it is the duty of this Court so to declare and adjudge. The duty is one of the gravest importance, and therefore should be approached and performed with the greatest deliberation and care. The people can be engaged in no act more important to their temporal welfare than in the framing of their organic law. It is the depository of the sovereign will, declaring and defining the rights of the citizen, distributing and limiting the powers of government, and so adjusting them as to be in harmony with the national will, as contained in the Constitution of the United States, and their own declared Bill of Rights.

The will of the people thus expressed, and constituting the ground-work of all State legislation, and the protection of individual rights, is entitled to the gravest consideration and respect, and when the judicial mind is brought to act upon it, even in the construction of doubtful phraseology, a degree of anxiety is felt that is not usual in the investigation of mere legal difficulties. How much more concern must it experience when the question is one of alleged conflict with the Federal Constitution? And hence the principle, that in doubtful cases of alleged conflict, Courts will support the law or the Constitution that is assailed, leaving it to the Supreme Judicial tribunal of the Union to determine the question in the last resort.

For a more distinct understanding of the questions as they arise in the case before the Court, it may be premised that the Constitution of this State, framed and adopted in 1864, provides that the General Assembly should pass a law for a uniform registration of the names of voters in this State, which registration should be evidence of the qualification of said voters to vote at any election thereafter held. (Article 1, sec. 2.) Qualifications and disqualifications of voters are prescribed, and it is declared to be the duty of all

75    v.23.

officers of registration carefully to exclude from voting or being registered all persons so disqualified, and it is made their duty to allow no person to be registered until he shall have taken the oath or affirmation set out and prescribed in such case to be taken; the taking of such oath, however, should not be deemed conclusive evidence of the right of the person so taking it to vote. (Article 1, sec. 4.) It further provides that the General Assembly shall pass laws for the preservation of the purity of elections, by the registration of voters, and by such other means as may be deemed expedient, and to make effective the provisions of the Constitution disfranchising certain persons. (Art. 3, sec. 41.)

The Legislature, at the session of January 1865, passed an Act relating to the registration of the voters of the State, (ch. 174.) The 5th section of this law enacts, that the officers of registration, after recording the surname and christian name of every person described in said section, "shall administer to such person the oath of allegiance, as prescribed by the fourth section of Article first of the Constitution, and the further oath, that he will make true answers to such questions as they may propound to him, touching his right to registration and voting, and enter in the proper column the fact whether such person has or has not been sworn." Section six provides, "that it shall be the duty of the officers of registration, before entering any name on the register of voters, to diligently inquire and ascertain that such person has not done any of the acts which are declared in the third, fourth and fifth sections of the said first Article of the Constitution, as causes of disqualification, and if the evidence brought to their knowledge shall satisfy them that he is disqualified under either of said sections, they shall not enter his name as a voter in said eighth column or register of qualified voters, but shall carefully exclude it therefrom, notwithstanding he may have taken the oath of allegiance prescribed in section four of said first Article of the Constitution." And by section eight they are required to enter in the said register of qualified voters

the name of every person who shall apply to them to be registered, and who shall satisfy them that he is qualified to vote under the provisions of the first Article of the Constitution, and the laws of the State.

These are the material provisions of the law which we are called to pass upon, in connection with the fourth section of the first Article of the Constitution. That section contains or specifies certain disqualifications from voting, and prescribes the oath of allegiance which the applicant for registration must take before his name can be registered as a qualified voter, and which if he declines to take, he shall not be allowed to vote; nor will the taking of the oath absolutely and conclusively entitle him to vote. The law in the sections referred to, purports to be in conformity with these provisions of the State Constitution, and this was not denied in the argument, except in the particular that the law in section five required a further oath to make true answers to such questions as might be propounded, touching the right to registration and voting. It was contended that this further oath was not required by the State Constitution, and was therefore unauthorized and illegal.

The petitioner declined or refused to take these oaths, when he applied for registration, but demanded that his name should be registered as a qualified voter, notwithstanding such refusal, and seeks to support such claim, or demand and justify such refusal, on the ground that these provisions, both of the law and the Constitution, are in conflict with that clause of the 10th section of the 1st Article of the Constitution of the United States, which prohibits any State from passing any bill of attainder, or *ex post facto* law; and that they also are repugnant to various Articles of the Bill of Rights, and consequently inoperative and void.

These are the questions which the Court is called upon to consider and determine, and they at once present the inquiry as to the origin and nature of the elective franchise, as understood in American constitutional law, and the

power of the States in their sovereign capacity, when form-
ing or amending their State Constitutions, to restrict or en-
large it, according to their sovereign will and the exigencies
of the public safety.

The right of suffrage is not an original, indefeasible
right, even in the most free of Republican Governments;
but every civilized society has uniformly fixed, modified
and regulated it for itself, according to its own free will
and pleasure, and in these United States, every Constitu-
tion of Government has assumed, as a fundamental princi-
ple, the right of the people of a State to alter, abolish and
modify the form of its own Government, according to the
sovereign pleasure of the people. The right to vote, like
the right to hold office, being thus conferred upon the voter
by the sovereign will of the people in their organic law or
Constitution of Government, the question, upon whom it
ought to be conferred, and what should constitute its boun-
daries and limits; in other words, what should qualify and
what should disqualify, is one which the people themselves
are to settle. So various are the circumstances, habits,
wants, character, conditions, pursuits, dangers and difficul-
ties of different people, that no fixed or certain rule can be
laid down, by which the right of suffrage can be imparted.
No one has ever yet pretended that the right should be
universal, in the most enlarged or extended sense of that
term, so as to embrace every age, sex, character and condi-
tion. In every State in the American Union, females are
excluded from voting and holding office, though taxable
citizens, and represented in legislative bodies; so with re-
gard to minors, though they, of the male sex, in addition
to being taxed if owners of property, and represented, are
also required to bear arms when of the required military
age and bodily constitution. In most of the States, Afri-
cans are excluded, though they may be taxed, and, under
certain circumstances of age, sex, &c., required to do mili-
tary duty. And even in the qualified class, exceptions are
made; in other words, disqualifications imposed. If, for

instance, all free white male persons over twenty-one years
of age, be qualified to vote under a general provision, ex-
ceptions can be made, and generally are made, so as to
exclude from the qualified class those who are aliens,
idiots, insane, paupers, &c., or those who may have been
convicted of crime, or those who may have by any means,
rendered themselves dangerous depositories of such a privi-
lege.   All these regulations and limitations are, in my
judgment, clearly acts of sovereign power, to be exercised
or not; and if exercised, to such degree or extent, as the
sovereign power shall determine.   The common good of the
whole, is the end proposed by every well organized society;
and if a restriction of the right of suffrage be deemed neces-
sary or expedient by the sovereign power to attain this
end, under the circumstances in which the public interests
are placed, there can be no valid objection so to exercise
this authority.   A liberal exercise of the power may at
one stage in the history of a people, be proper and judi-
cious, whilst, at another, a more restrictive policy may be
demanded.   And what one people may regard as essential,
another, at the same time and under similar circumstances,
may consider injurious or prejudicial, and therefore, may
make different provision to avoid the danger.   These prin-
ciples and views Justice STORY deduces from all the lead-
ing authorities upon this subject—the best writers upon
natural and constitutional law, both of our own country,
and those countries in Europe, in which liberal institutions
have in any form or at any time existed.   1 *Story on Con-
stitution*, sec. 577 to 584.

That the right of suffrage is a very important privilege,
and cannot be too highly estimated, no one will deny; and
that it should be distinctly defined, and strictly guarded, is
as readily conceded.   The free exercise of the right by those
entrusted with it, and the purity of elections, are funda-
mental principles of free Government.

In our system of Government, the power to prescribe the
qualification of the voter resides with each State of the

Union. The Constitution of the United States does not only not restrict this right, but expressly concedes it to the States, and, further than this, entrusts to them "the very important power of ascertaining and directing the qualifications of those who shall be entitled to elect the most numerous branch of the national Legislature," (2 *Wil's Lectures*, 131,) for by the Constitution of the United States, (Art. 1, sec. 2,) the members of the House of Representatives, shall be chosen "by the people of the several States, and the electors in each State, shall have the qualifications requisite for electors of the most numerous branch of the State Legislature." The same rule applies to the election of Presidential Electors, when that body is made elective. The Constitution of the United States, does not adopt this rule, because of any supposed or prescribed uniformity, but in the very face of a conceded, and ofttimes very material diversity. The election of these Representatives to Congress, says Mr. MADISON, (*Federalist, No.* 54,) "is to be exercised *by such part of the inhabitants as the State itself,* *may designate.*" He adds, "the qualifications on which the right of suffrage depends, are not perhaps the same in any two States. In some of the States, the difference is very material. In every State a certain proportion of inhabitants are deprived of this right by the Constitution of the State, who will be included in the census, by which the Federal Constitution apportions the Representatives," &c. How large this proportion, thus deprived of the right, is, can be estimated by adding to the female portion, (always or generally equal to one-half of the entire population of a State,) others who are disqualified, as minors, insane, aliens, without residences, &c., &c. The voting population of a State is not only largely less than one-half of its entire population, but varies in numbers, according to the disqualifications which each State imposes. (1 *Story on Const.*, sec. 580, 582.) These differences all arise from the sovereign pleasure of each State, generously confided in by the Government of the United States, inasmuch as in this

particular, she rests herself, as has been well said, on the Governments of the several States; her own protection, as a Republican form of Government, being in the 4th section of the 4th Article of the Federal Constitution, which provides, that "the United States shall guaranty to every State in this Union, a Republican form of Government." Her own existence, as a Government of this form or character, therefore depends on those of the States. (2 *Wil's Lect.*, 131, 132.)

The right of suffrage should be defined, and its limitations expressed in the Constitution. This is justly regarded, says Mr. MADISON, as a fundamental Article of Republican Government. (*Federalist, No.* 52.) It peculiarly and properly belongs to the sovereign power of a State to declare and define it. The Constitution of a State is the work of the people of that State. It differs from an ordinary Act of legislation, in this, that the latter is the Act of a representative body, created by the Constitution itself, and acting within the limits prescribed to, or the powers conferred upon it by that instrument.

The Constitution of Maryland, of 1864, was framed and adopted whilst a most gigantic rebellion existed, and had been waged for three and a half years, against the authority and government of the United States. The struggle by the insurgents was to sever and dissolve the Union of the States; that of the Government of the United States, to maintain and preserve it. Maryland occupied the position of a State on the line separating the contending parties; her people divided in sentiment and action,—a considerable portion having left her soil and joined themselves to the cause of the rebellion. Her own territory had been thrice invaded by the insurgent armies in great force; her citizens despoiled of their goods; her fields devastated and crimsoned by the blood of battles; and the relation of the State to the Union, the very palladium of her security and liberties, threatened and endangered. How far those of her people who united in this effort to destroy the Union and

assisted in bringing the war, in all its horrors, within her borders, and those of them who aided and abetted the rebellion, or desired success to its arms, were to be deemed safe depositories of the right of suffrage, was a matter for the judgment and determination of the Convention of the people of the State which assembled to revise, amend and alter the Constitution of the State, and for the people themselves when called upon to adopt the instrument itself, thus prepared and submitted by the Convention. What was done by the Convention and people in this respect, is made a matter of grave charge and complaint, and is arraigned as in conflict with the Constitution of the United States, and the inalienable rights of freemen.

Whether this be so or not, has been very fully and ably argued by counsel, and carefully and dispassionately considered by the Court.

The Bill of Rights (7th Article) provides, that "every free white male citizen, *having the qualifications prescribed by the Constitution*, ought to have the right of suffrage." This is identical with the provision in the Declaration of Rights in the Constitution of 1851, (Art. 5.)

It will scarcely be contended that the clause, *"having the qualifications,"* &c., does not embrace those who are not subject to the disqualifications prescribed by the Constitution. Not to be disqualified is to be qualified. The qualification of a voter is to be determined not simply by what may be affirmatively expressed in the instrument conferring the privilege, but also by what may be negatively declared. One may be qualified by the terms of a general rule, and yet disqualified by the exceptions to the rule. This is too plain for further elucidation.

The 1st section of the 1st Article of the Constitution affirmatively prescribes the qualifications of voters: "Every white male citizen of the United States, of the age of twenty-one years or upwards, who shall have resided in the State one year next preceding the election, and six months in any county or in any legislative district of Baltimore city, *and*

*who shall comply with the provisions of this Article of the Constitution,* shall be entitled to vote at all elections hereafter held in this State." This is the general rule.

All not within the terms of the foregoing description are therefore disqualified. They exclude a very large portion, more than one-half of the community, namely: all females; all persons of African blood; all aliens and persons not naturalized; all white male persons under twenty-one years of age; all white male citizens who have not resided in the State one year next preceding the election, and six months in the county or in any legislative district in Baltimore; and all white male citizens of twenty-one years or upwards, &c., *who will not comply with the provisions of this 1st Article of the Constitution."* These are, most generally, the persons disqualified by every other Constitution in the Union.

The Constitution, however, does not stop with the 1st section. It proceeds to make certain exceptions also from those who fall within the limits of qualified voters in the 1st section. By the 3rd section, persons above twenty-one years, convicted thereafter of larceny or other infamous crimes, and not pardoned, and persons lunatic or *non compos mentis,* shall not be entitled to vote. By the 4th section, persons who have been at any time in armed hostility to the United States, or the lawful authorities thereof, or who have done any of the disloyal acts, or made the declaration or expressed the disloyal desire therein specified, shall not enjoy the right of suffrage, unless the disability be removed in the manner therein provided. The 5th section refuses the right to vote to any person convicted of certain acts of bribery or corruption set forth in the section. These disqualifications constitute the exceptions to the general rule of qualification in the 1st section.

The 4th section also prescribes an oath to voters, to be administered at the first election under the Constitution, to any person offering to vote; and at any subsequent election the same oath may be administered. This oath is in these

words: "I do swear (or affirm) that I am a citizen of the United States, that I have never given any aid, countenance or support to those in armed hostility to the United States, that I have never expressed a desire for the triumph of said enemies over the arms of the United States, and that I will bear true faith and allegiance to the United States and support the Constitution and laws thereof as the supreme law of the land, any law or ordinance of any State to the contrary notwithstanding; that I will in all respects demean myself as a loyal citizen of the United States, and I make this oath or affirmation without any reservation or evasion, and believe it to be binding on me."

Any person declining to take this oath shall not be allowed to vote, *but* (it is declared) *the taking of such oath shall not be deemed conclusive evidence of the right of such person to vote; and that it shall be the duty of all officers of registration and judges of election carefully to exclude from voting, or being registered, all persons so as above disqualified.*

Such are the provisions OF THE CONSTITUTION in relation to the qualifications and disqualifications of voters, and the mode of ascertaining the status of him who offers to vote. For the purpose of this ascertainment, however, the Constitution further provides, that the General Assembly shall provide BY LAW for a uniform registration of the names of the voters in this State, which registration shall be evidence of the qualification of said voters to vote at *any election thereafter held, and after said law shall have been passed and carried into effect, no person shall vote unless his name appears on the register.* (Art. 1, sec. 2.) It is the declared duty of *all officers of registration carefully to exclude from voting or being registered all persons disqualified; and they are to allow no person to be registered until he shall have taken the oath or affirmation set out in the fourth section of said Article.* (Art. 1, sec. 4.) And the 41st section of Art. 3 provides, that the General Assembly shall pass laws for the preservation of the purity of elections by the *registration*

*of voters, and by such other means as may be deemed expe-
dient; and to make effective the provisions of the Constitution
disfranchising certain persons, or disqualifying them from
holding office.*

With a view to carry out these constitutional provisions,
the General Assembly, at its session in January 1865,
passed the law for the registration of the voters of the
State.   No objection has been made to the law as not being
compatible with the foregoing provisions of the State Con-
stitution, except in the one particular, that the law requires,
in section 5, the officers of registration to administer to the
applicant for registration "the further oath, that he will
make true answers to such questions as they may propound
to him, touching his right to registration and voting."   It
was insisted in the argument that such further oath is not
required by the Constitution, and that therefore the regis-
tration law, so far as this further oath and the examination
of applicants upon interrogatories propounded to them are
concerned, is unauthorized and void.

It is true the Constitution of the State does not, in ex-
press terms, authorize such further oath to be administered
to the applicant.   But it does expressly require all officers
of registration and judges of election carefully to exclude
from voting, or being registered, all persons disqualified;
and the judges of election, at the first election, were enjoined
to administer to any person offering to vote, the oath or af-
firmation set out in terms in the 4th section of the 1st Ar-
ticle; and then provides *that the taking of such oath shall
not be deemed conclusive evidence of the right of such person
to vote.*   The 41st section of the 3rd Article authorizes the
Legislature to pass laws for the purity of elections by the
registration of voters, and by such other means as may be
deemed expedient, and to make effective the provisions of
the Constitution disfranchising certain persons.

Taking these provisions of the Constitution together, and
looking to the object and purpose of the Constitution designed
by them, the inconclusiveness of the oath is as apparent in

the case of registration as in the case of elections prior to the passage of a registration law. If, in the one case, it shall not be deemed conclusive, a further examination may be gone into; so in the other, when the evidence of qualification of the voter is to be placed in a more permanent form, and after a fuller and more careful examination, and to make the provisions of the Constitution, disfranchising certain persons, effective, it cannot be perceived on what ground, or for what reason, the oath itself should be deemed conclusive. The 4th section of the 1st Article impliedly confers the power; but taken in connection with the 41st section of the 3rd Article, I consider the power of the Legislature to authorize such further oath to be administered, and the consequent personal examination of the applicant himself touching his right to registration and voting, to be full. It was competent for the Legislature, in making effective these provisions of the Constitution, to require such further oath and examination.

I proceed now to the other and main inquiry arising under the petition, and urged with great force in the argument, whether the 4th section of Article 1st of the Constitution, and the Registration Law carrying out its provisions, are in conflict with the 10th section of the Constitution of the United States, which prohibits any State from passing any bill of attainder or ex post facto law.

Bills of attainder, which include bills of pains and penalties, are prohibited as well by the Constitution of Maryland, (18th Article of the Declaration of Rights,) as by the Constitution of the United States. They are special Acts of the Legislature, inflicting capital or other punishments upon persons supposed to be guilty of an offence, without any conviction in the ordinary course of judicial proceedings. In such cases, the Legislature assumes judicial magistracy, pronouncing upon the guilt of the party without any of the common forms and guards of trial, and satisfying itself with proofs, when within its reach, whether conformable to the rules of evidence or not. 2 *Story on*

*Const.*, *sec.*, 1344. Of the same class are *ex post facto* laws. They are also prohibited by the Constitution of Maryland, (Art. 17, Declaration of Rights.) "This phrase applies to acts of *criminal nature only*, and the prohibition reaches every law, whereby an act is declared a crime, and made punishable as such, when it was not a crime when done; or whereby the act, if a crime, is aggravated in enormity or punishment; or whereby different or less evidence is required to convict an offender, than was required when the act was committed." "An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed." 2 *Story on Const.*, *sec.* 1345. *Calder vs. Bull*, 3 *Dall.*, 386. *Fletcher vs. Peck*, 6 *Cranch*, 138. *Same case*, 2 *Pet. Cond. R.*, 308.

These enactments are for the personal security, and the protection of the private rights of the citizen, and are great constitutional bulwarks which are not to be violated. They differ only in this, that in the one case, that of a bill of attainder, the Legislature becomes the judge, and pronounces the guilt of, and the punishment upon, the offender; whilst in the other, the prior act is declared a crime, or aggravated in its enormity or punishment; or a different or less evidence prescribed for a conviction; leaving the trial with the judicial tribunals of the State. It has been well settled, that the term *ex post facto law*, is not applicable to civil laws, but to penal and criminal laws only. Retrospective laws generally, such as may divest antecedent vested rights of property, are not prohibited by the Constitution of the United States, but only such as are technically *ex post facto;* namely, such as relate to criminal matters only. *Watson vs. Mercer*, 8 *Pet.*, 110.

It was gravely urged in the argument, and in support of this petition, that the acts of disqualification in the 4th section of the 1st Article of the Constitution of Maryland, and, as a consequence, so much of the Registration Law as conforms to the provisions of this section, fall within the prohibition of the Constitution of the United States, and

these received definitions and construction of the terms used. That the 4th section does not meet the definition of a bill of attainder, is very manifest. It sits in judgment on no particular person or persons for acts ·done, pronouncing them crimes, applying its own rule of evidence, and inflicting punishment. Nor does it, by way of an *ex post facto* law, declare certain ·acts already done, as crimes, which were not so before, and hand over the offender to the public criminal tribunals for trial, conviction and punishment. But it was assumed and insisted on in the argument, that although these technical peculiarities did not appertain to the section, yet the disqualifications it imposed were a *punishment* for acts declared *unlawful;* and that this fixed upon it the character of an *ex post facto* law. But the section, in no part of it, declares these acts to be crimes against the . State, and directs those who had committed them to be tried, and upon conviction, adjudged to forfeit their right of suffrage. The mere use of the term *unlawful*, as applied to these acts of disqualification, or the provision for restoring the person disfranchised, to *his full rights of citizenship* by an Act of the Legislature, are not to be construed to have the force and effect of enacting these disqualifying acts and words into crimes against the State, to be inquired into and punished by the loss of the offender's right of suffrage or holding office. These acts are described as unlawful, because unlawful in their very nature, and as contrary to the laws of the United States, to which allegiance is a paramount duty, and so declared by the 5th Article of the Declaration of Rights. To call them unlawful, was merely to designate them by the name and character they bore already. The denial of the right of suffrage to such as may have engaged in them, is simply a denial of a privilege to those who, because of their unlawful relations to the United States, were considered not proper and safe subjects for its enjoyment. The denial of the right to those who are excluded by the 1st section, viz : to females, Africans, aliens, minors, &c., is not by way of punishment;

nor to a lunatic or person *non compos mentis*, in the 3rd section. And so the denial of the right to those enumerated as disqualified, in the 4th section, cannot, with any greater propriety, be regarded as a punishment. If the Constitution had prohibited paupers or confirmed inebriates from voting, though they had enjoyed the right before, would such exclusion be regarded as a punishment for past offences? The negro, holding a certain amount of property, once voted in Maryland. He was deprived of the right by a subsequent change of the Constitution. Was that act of the sovereign will ever regarded as an *ex post facto* law? Or, suppose the people of Maryland, in reforming their Constitution, had, for reasons of policy, chosen to withhold the right from any soldier, seaman or non-commissioned, or commissioned officer in the service of the United States, as many of the Constitutions of the States in the Union do, would this be regarded as in contravention of their rights under the Constitution of the United States, and a punishment for crime committed? If so, all changes of the organic law restrictive of the right, or conferring it upon conditions which did not exist before, would be regarded as conflicting with the Constitution of the United States and void.

A disqualification to vote or hold office for such cause as the popular will, may declare prejudicial to the public safety, or inconsistent with sound policy—the exclusion of a class regarded as inimical to the public welfare and interests, is not by way of punishment to the individuals affected but as a protection to the body politic. All that can be said in such cases is, that the right is not conferred, for reasons of public policy deemed expedient by the Constitution making power, the people of the State in Convention assembled.

The deprivation of the right to vote or hold office, may become a penalty or punishment for crime. As in a case where the right *has been conferred by the Constitution*, and the Constitution also provides, that upon conviction for

crime, the party privileged, *shall thereafter be deprived of it.* Such is the provision in the first clause of the 3rd section, in cases of conviction for larceny or other infamous crime; and also the provisions in the 5th section against bribery. By these, in addition to the other punishments prescribed by law for the offences, the party convicted, shall also be disqualified from thereafter voting or holding office. In these cases, the right is subject to forfeiture, after having been conferred. But if the Constitution had provided that all persons who had *previously been convicted of crime, should not be entitled to vote,* this would simply be a disqualification, and not an additional punishment. Of this latter class is the provision in the Constitution of Virginia, which is in these words : " And no person shall have the right to vote, who is of unsound mind, or a pauper, or a non-commissioned officer, soldier, seaman or marine, in the service of the United States, or who *has been convicted* of bribery in an election, or of any infamous offence." (Constitution of Virginia, of 1850, 1851, Art. 3, sec. 1.) This is clearly a disqualification,—not a punishment. It is found in an Article entitled : " Qualification of Voters," and in a section which contains both the qualifying description, and the disqualifying exceptions.

If I am right in these positions, then all the argument which has been addressed to the Court in relation to the deprivation of rights or punishment of offences, by the 4th section of the 1st Article of the Constitution and the Registry Law, made in pursuance of it, as being without due process of law, falls to the ground. The right to vote being conferred upon those qualified by the Constitution, or not subject to its disqualification, is vested only during the continuance of the popular will. A person entitled to vote, and voting during one constitutional period, may fall within a class disqualified, for public reasons, during another period of constitutional change. And so, a class disqualified at one time, may be deemed worthy of the right or privilege at another. When the right is conferred, and its

exercise enjoyed under an existing Constitution, the citizen invested with it cannot forfeit it, *criminaliter*, without due process of law, nor can its exercise be improperly interfered with, without a legal remedy and redress. This Court has properly laid down the law in this respect, in the recent case of *Bevard vs. Hoffman, et al.*, 18 *Md. Rep.*, 483, 484. That was an action brought against the judges of election in the 8th election district of Carroll county, to recover damages for their refusal to permit the plaintiff to vote at the Presidential election of 1856.

It was argued in that case, on behalf of the plaintiff, that the action lay as well where the citizen was deprived of his vote by the mistaken judgment of the judges of election, as where he was deprived of it by their willful, corrupt or malicious action; and that the absence of fraud, corruption or malice in the judges could only be urged in mitigation of damages; and that this view of the law was best calculated to secure to the citizen the exercise of the invaluable right of suffrage, and at the same time relieve from unnecessary damages those appointed to preside at elections, who may reject a qualified voter from an honest mistake; and for this several authorities were cited, both in England and the United States. But the Court (his Honor, Judge BARTOL, pronouncing the opinion) did not adopt this view, and considered the strongest of the cases cited as not supporting it. "The decisions in these cases (say the Court) assert the principle, that a party who, like the plaintiff, has been deprived of a right, is thereby injured, and must have his remedy. It seems to us that the error of the application of that principle to this case, consists in a misapprehension of what is the right of a citizen under our election laws. In one sense, if he is a legal voter, he has the right to vote, and is injured if deprived of it; but the law has appointed a means whereby his right to vote is decided, and for that purpose has provided judges to determine that question, and has also provided the most careful guarantees for a proper discharge of duty by the judges, by the mode of their

selection and their oaths of office. In all governments power and trust must be reposed somewhere; all that can be done is to define its limits and provide means for its proper exercise. When the act in question is that of a judicial officer, all that the law can secure is a guarantee that they shall not with impunity do wrong *willfully*, *fraudulently* or *corruptly*. If they do so act, they are liable both civilly and criminally; but for an error of judgment, they are not liable, either civilly or criminally. If the citizen has had a fair and honest exercise of judgment by a judicial officer in his case, it is all the law entitles him to, and although the judgment may be erroneous, and the party injured, it is '*damnum absque injuria*,' for which no action lies. This, in our opinion, is the most reasonable rule, and it will be found supported by the weight of authority, both in England and in this country.''

The foregoing opinion, containing a clear enunciation of the law in the case in which it was announced, is of pertinency and value in the consideration of the few remaining points in the cause before us.

The right to vote—the question of qualification or disqualification of the person offering to vote—is to be decided by the tribunals established by the law for the ascertainment of the necessary facts that enter into the inquiry. Means are appointed and judges provided to determine the question, with all the guards that the nature of the investigation admits of. This power and trust must be reposed somewhere; and in this State, and in all the States of the Union, it has been committed to judges of election, who are *quasi* judicial officers, clothed with the powers and discretion necessary for the performance of the duty, as delicate as it is important to the well-being of republican government. The registration of voters is but another mode for attaining the same ends, introduced into the government of some of the States, and now authorized in Maryland. It has the advantage of ascertaining, before the days of election, who are qualified to vote at the elections when they arrive. The

Anderson *vs.* Baker, *et al.*

officers appointed to ascertain and register the qualified voters are, by the law of Maryland, at the first registration, the same in number for each election district as the judges of election. They are appointed, by the Executive of the State, with care and a just regard to their qualifications for the duties of the office. They are sworn to perform these duties to the best of their skill and judgment, diligently and faithfully, without partiality or prejudice, &c. They are to sit at times and places made known to all interested by the most public notice; and their mode of procedure is carefully marked out by the law. The judges of election are, by this means, relieved from duties which they could but imperfectly perform in the brief space of one day, at the crowded polls of an exciting election.

It was also much insisted on, in the argument, that it was a violation of the 22nd Article of the Declaration of Rights, to require a voter to give evidence against himself. In *criminal* cases this could not be done, and it is only to criminal cases that the Article has application. In the view taken in this opinion, the personal examination of the voter under oath, contemplated or required by the Registration Act, can only be on such matters *as touch his right to registration and voting*. If the voter can be examined on oath as to age, residence or color, or as to his knowledge of facts calculated to lead the mind of the judge to a proper conclusion upon these points of qualification, so the same examination can be pursued when the matter of inquiry is any other of the disqualifications specified in the Constitution. If a party is disqualified by reason of his having been in armed hostility to the United States, his refusal to answer the question will not expose him to a criminal proceeding by the United States for treason. Nor will a negative answer. An affirmative answer might have that effect, and would be a proof of his disqualification to vote. But he is not more compelled to answer the question than he is to give an illegal vote, or to attempt to have his name registered as a legal voter, when his own conscience tells him,

when probed, that he is in fact legally and constitutionally disqualified.

The argument that the 23rd Article of the Bill of Rights would be violated in carrying out the 3rd section of Article 1 of the Constitution, in relation to disqualifications for larceny or other infamous crime, or the 5th section, for bribery, seems to be based upon a misapprehension of those sections. It is the *conviction* in both, and of course "by the law of the land," or "by due process of law," that disqualifies. The judges of election or the officers of registration in neither case are to try and convict, but only to determine the fact of a previous conviction. They are to determine by evidence (the kind and degree it is not for this Court now to say) the fact, whether the party has *been convicted* of any of the offences mentioned. In my view of these sections, the conviction spoken of is one that has taken place since the adoption of the Constitution. Since that date, and before any of the elections under it, (except the one adopting it,) or before the Act of Registration went into effect, such convictions may have taken place, which would gratify the language and provisions of the Constitution and the law, so far as those elections, or the first registration of voters, are concerned. Their application to cases arising beyond these in the future, is of course the more obvious. The punishment for bribery under the Constitution of 1851, (Art. 1, sec. 2,) was the same with that in the 5th section of the present Constitution; so that all that relates in said 5th section to convictions for Acts of bribery since the 4th of July 1851, and prescribing the punishment therefor, is not *ex post facto.*

I therefore do not regard these provisions of the Constitution of this State, or of the Act of Registration, as obnoxious to the charge of being in conflict with the Constitution of the United States, or the Bill of Rights of Maryland. This Court has furnished a rule of construction applicable to the latter. "The Declaration of Rights and the Constitution compose our form of government, and must be

interpreted as one instrument. The former announces principles on which the government, about to be established, will be based. If they differ, the Constitution must be taken as a limitation or qualification of the general principle previously declared, according to the subject and language employed." *Mayor, &c., of Balto., ex rel. of the Board of Police,* 15 *Md. Rep.,* 459. If error has been committed, our admirable system of government affords the means of correction by a resort to the highest judicial tribunal in the land, the Supreme Court of the United States.

The question that has been submitted to the consideration of this Court, is purely a judicial one. We can exercise no legislative or conventional powers. The Convention and people of Maryland have incorporated into their Declaration of Rights the duty of paramount allegiance to the Constitution and Government of the United States, and have seen proper in their wisdom and in the exercise of the sovereign power of the State, to declare and enact that all those who bore arms against the United States, or have been in any manner in the service of the so-called "Confederate States of America," or have aided the rebellion in various other ways, and manifested by open word or deed their adhesion to the cause of the enemies of the United States, or their desire for the triumph of said enemies over the arms of the United States, should not be entrusted with the right of suffrage: that they, in other words, should not participate in the elections in Maryland of *State* or *National officers,* unless their hostile acts and dispositions shall have been repudiated or changed by honorable military service since in the armies of the United States, or the right of suffrage shall be restored to them by an Act of the General Assembly, passed by a vote of two-thirds of all the members elected to each House. The wisdom of these measures rests with the people. Whether they should be altered, it is for the people to determine, in the manner and at the time provided for in the Constitution itself.

If learned counsel were right in the declarations made to

the Court, that they disfranchised two-thirds or three-fourths of the sons of Maryland, it is a matter of deep regret and mortification that so many should have been found faithless to her standard, when the call of duty and paramount allegiance summoned them to the maintenance of her cause, which was the cause of the Union. A single one, found in the ranks or on the side of the enemy, was too many. But it is to be remembered that it is not to be taken for granted that all who did not register their votes are necessarily disfranchised by the Constitution. To register is a voluntary act. And so is a refusal to be registered. It is not more compulsory than the act to vote or not to vote. A far more favorable representation of the loyalty of the citizens of Maryland, is found in an official document. According to the proclamation of the Governor, announcing the vote upon the adoption of the Constitution, 59,973 votes were polled for and against that instrument; and at the Presidential election of 1864, occurring soon after the adoption of the Constitution, the popular vote of Maryland was within a fraction of 70,000 votes, only 13,500 less than at the election for Governor, in 1861. The qualifications of the voters were the same then as now. They were judged of then by the judges of election, instead of, as now, by the officers of registration. But the change in the mode or means of determining the qualification of the voter, can make no change in the result.

I am therefore of the opinion that the writ of *mandamus* was properly refused by the Circuit Court for Montgomery county, and its judgment should be affirmed, with costs to the appellees.

BOWIE, C. J., delivered the opinion of the Court, Judges GOLDSBOROUGH, COCHRAN and WEISEL, concurring therein:

This is, substantially, an inquiry into the power of the people of a State, in Convention assembled, to regulate the elective franchise, and prescribe the qualifications and disqualifications of voters.

It is not to be determined by the passions or the prejudices of the hour, but upon principles which lie at the base of all Government. Not only Maryland, but all the States of the Union, and those which may be admitted, are deeply interested in the principles in question.

It is the first instance, in which the Acts of a Convention, have been sought to be restrained by judicial interposition, upon the ground of their inconsistency with the Federal Constitution. The novelty, as well as the importance of the questions, dictate the utmost caution in arriving at conclusions which may prejudice, not individuals only, but communities of men. It is the highest exercise of judicial authority, to set aside *legislative* Acts, because of their violation of the fundamental law; how transcendent the power, which annuls the *organic law* of the State, from which it derives its being ! " All judicial authority pre-supposes the validity of the Constitution, under which it acts."

In the distribution of powers among different functionaries, it often happens that each functionary, or department, must decide upon the constitutionality of the exercise of such power, and in many cases, these decisions become final and conclusive, being from their nature and character incapable of revision. " Thus in measures exclusively of a political, legislative or executive character, as the supreme authority as to these questions, belongs to the legislative and executive departments; they cannot be re-examined elsewhere." 1 *Story on the Const.*, sec. 374. " The remedy in such cases, is solely by an appeal to the people at the elections; or by the statutory power of amendment, provided by the Constitution itself." *Ibid.* The Convention concentrated in itself all these powers, its members assumed the same oath to support the Constitution of the United States, which is taken by all officers, State and Federal, and must be presumed to have been equally observant of its obligations.

The powers of a Convention of the people of a State assembled to frame a form of Government, are no where de-

fined. It is the right of the people to alter or abolish, or institute a new Government, "laying its foundations on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness." The Convention is the depository of the re-siduary or reserved sovereignty of the people, unlimited, except so far as restrained by the Constitution of the United States, and the moral law. Whether their action is dependent upon the subsequent ratification of the people or not, is not clearly established; but when ratified and adopted, or acquiesced in, their acts are unquestionably within the limits prescribed. The wisdom or wantonness of the act, its effect upon majorities or minorities, are not subjects of judicial cognizance. These are determined by their adoption. The Courts are not to inquire how many will be affected by their decision, or look to the multitude for their vindication; the rights of a single citizen are as valuable, in the eye of the law, as those of thousands.

Unity in the great ends and objects of Government, is the source of all political power in Republics. For the promotion of these objects, the people of the United States ordained and established a Constitution, which was the supreme law, and erected a national Government, to which they owed paramount allegiance. 2 *Hill S. C. Rep.*, 248.

This supreme Government was assailed, its authority defied, its capital invested, the Territory of Maryland, (whose people had adopted it,) invaded by armies, her towns placed under contribution, her citizens slain and imprisoned, in the name and on behalf of the Confederate States of America. A sovereign Convention of the people assembled in the midst of this civil convulsion, endeavored to strengthen and cement the Union, by removing the great causes of rebellion, the motives for its continuance, encouragement and support; and to secure themselves from anarchy, and social, as well as civil war. They framed a Declaration of Rights and Constitution, submitted them to the people for ratification, and after their adoption had been

proclaimed, the old Government was superseded and a new one inaugurated. The executive, legislative and judicial departments, have all sworn to support and maintain it as such. This Constitution, it is conceded, must be assumed and recognized as the organic law of the State. The chief characteristics which distinguish it from former instruments of the kind, are, the declaration of the fundamental principle, that "*every citizen of this State, owes paramount allegiance to the Constitution and Government of the United States, and is not bound by any law or ordinance of this State, in contravention or subversion thereof,*"—its incorporation, with the right of suffrage; and the abolition of involuntary servitude, except for crime.

It is manifest, that a leading object of the Convention was, to repudiate the doctrine, that any State could by law or ordinance, absolve its citizens from the obligation of obedience to the Constitution and Government of the United States, and to render the Union indissoluble, by excluding from the polls and offices of the State, all who had actively participated in promoting the rebellion, or giving them aid and comfort. "Allegiance is the ligature, that binds the citizen to the Government which protects him." It is the very antipodes of treason, which, according to the common law definition, is a violation of the obligation of allegiance. The Confederate States had attempted to dissolve the bond of Union, and legalize treason, by the sophistry of secession. Some States yielded only a partial allegiance; Maryland avowed paramount allegiance as the antidote of the right of secession.

The prevalence of this political theory was urged by one of the counsel for the relator, in extenuation of those engaged in the rebellion. Its existence is not less an apology ( if one is needed,) for the action of the Convention. If it so pervaded the people, that organized armies were ready to destroy the Government their fathers framed, it became the more necessary for the friends of that Government to strengthen the hands of those who were charged with its

defence. Without some such provision, citizens of Maryland, in arms against the United States, would have been qualified voters at the ensuing elections. The soldiers of Stuart and Early, should the war have continued, might have claimed the right of suffrage unchallenged, under a Constitution professing paramount allegiance to the United States. Such an absurdity would have been too glaring to contemplate.

In promotion of this general purpose, the General Assembly were required to provide by law for a uniform registration of the names of voters, which should be evidence of their qualification at elections thereafter held, and to make effective the provisions of the Constitution, disfranchising certain classes of persons. *Const.*, *Art.* 1, *sec.* 2. *Art.* 3, *sec.* 41.

In pursuance of these express constitutional commands, the Act of the 24th of March 1865, was passed.

It is insisted this law is null and void, because it violates the Constitution of the United States, and the Constitution of the State, in execution of which it was enacted; and further, that the 4th section of Article 1 of the Constitution of Maryland, disqualifying certain classes, is in conflict with that of the United States, and therefore void.

Three propositions are assumed as the basis of these conclusions:

1st. "The franchise of voting is an inalienable right of property *sui generis.*"

2nd. "Section 4 of Article 1 of the Constitution of Maryland, and the registry law, are in the nature of a bill of attainder, which includes also bills of pains and penalties."

3rd. "The disqualifications, including the test oath, declared by section 4, Article 1, and the provisions of the Registration Act, are violations of section 10, Article 1 of the Constitution of the United States, declaring: 'No State shall pass any bill of attainder or *ex post facto* law.'"

It is conceded, by the argument of the senior counsel for the relator, that sovereign Conventions of the people, prior to the adoption of the Federal Constitution, had unlimited

power to fix, change or modify the qualifications of voters, but since its adoption, they are restrained by the 10th section of Article 1 of that instrument. This, we apprehend, is a *"petitio principii;"* it is the question before us, whether, properly construed, there is any limitation upon the power the people of the States previously possessed and exercised in that respect. There is no allusion to any such purpose in the cotemporaneous expositions or subsequent commentaries on the Federal Constitution by its friends or its adversaries. On the contrary, the inference is almost irresistible, no such limitation would have been tolerated. *Rawle on the Constitution, ch.* 4, *p.* 40. *Story on Constitution, vol.* 1, *sec.* 548.

Among the absolute, unqualified rights of the State, is that of regulating the elective franchise. It is the foundation of State authority. The most important political function exercised by the people in their sovereign capacity. The 3rd Article of the Declaration of Rights affirms, ''that the people of this State ought to have the *sole and exclusive right* of regulating the internal government and police thereof.''

Whilst ''the right of the people to participate in the Legislature is the best security of liberty and foundation of all free government,'' yet it is subordinate to the higher power of regulating the qualifications of the electors and the elected. The original power of the people, in their aggregate political capacity, is delegated in the form of suffrage to such persons as they deem proper, for the safety of the Commonwealth, hence the right is limited to *''every free white male citizen* having the qualifications prescribed by the Constitution.'' Citizenship and suffrage are by no means inseparable; the latter is not one of the universal inalienable rights with which men are endowed by their Creator, but is altogether conventional

STORY, treating of this subject, says: ''Every Constitution of government in these United States has assumed, as a fundamental principle, the right of the people of the State to

alter, abolish and modify the form of its own government, according to the sovereign pleasure of the people. In fact, the people of each State have gone much further, and settled a far more critical question, by deciding who shall be the voters entitled to approve and reject the Constitution framed by a delegated body under their direction." 1 *Story on Const.*, ch. 9, sec. 581. * * * * "From this it will be seen how little, even in the most free of republican governments, any abstract right of suffrage, or any original and indefeasible privilege has been recognized in practice." *Id.* * * * * "In no two of these State Constitutions will it be found that the qualifications of the voters are settled upon the same uniform basis, so that we have the most abundant proofs that among a free and enlightened people, convened for the purpose of establishing their own forms of government, and the rights of their own voters, the question as to the due regulation of the qualifications, has been deemed a matter of mere State policy, and varied to meet the wants, to suit the prejudices, and to foster the interests of the majority. An absolute, indefeasable right to elect or be elected, seems never to have been asserted on one side, or denied on the other; but the subject has been freely canvassed, as one of mere civil polity, to be arranged upon such a basis as the majority may deem expedient, with reference to the moral, physical and intellectual condition of the particular State." *Id.*, sec. 582.

None of the elementary writers include the right of suffrage among the rights of property or person. It is not an absolute, unqualified, personal right. Lord HOLT, in *Ashby vs. White*, placed it upon the ground that it was incident to the freehold which the voter owned, or to the burgh or corporation to which he belonged; that it was a part of the Constitution of England, that these boroughs should elect members to serve in Parliament, whether they be boroughs corporate or not corporate; in the one case, the right of election is a privilege annexed to the land, and may be properly called a real privilege; the second sort is, where a

corporation is created by charter or prescription, and the members of the corporation, as such, choose members to serve in Parliament. The first sort have a right of choosing as a real right, but here in this last case, it is a personal right, and not a real one, and is exercised in such manner as the charter or custom prescribes, and the inheritance of this right is in the whole body politic, but the exercise and enjoyment of this right is in the particular members. 2 *Ld. Raymond,* 950, 951. The cases relied on by the appellant, have not been recognized as law in this State.

*Ashby vs. White,* and *Lincoln vs. Hapgood,* 11 *Mass.,* were reviewed and overruled in *Bevard vs. Hoffman,* 18 *Md. Rep.,* 483. In that case this Court said: "The decisions in those cases assert the principle, that a party who, like the plaintiffs, has been deprived of a right, is thereby injured, and *must have his remedy.* It seems to us, that the error of the application of that principle to this case, consists in misapprehension of what is the right of a citizen under our election laws. In one sense, if he is a legal voter, he has the right to vote, and is injured if deprived of it; but the law has appointed a means whereby his right to vote is decided, and for that purpose has provided judges to determine that question, and has also provided the most careful guarantees for a proper discharge of duty by the judges, by the mode of their selection and their oaths of office. In all governments, power and trust must be reposed somewhere, all that can be done is to define its limits, and provide means for its exercise; when the act in question is that of a judicial officer, all that the law can secure is, a guarantee that they shall not with impunity do wrong *willfully, fraudulently or corruptly.* If they do so act, they are liable both civilly and criminally; but for an error of judgment, they are not liable either civilly or criminally. If the citizen has had a fair and honest exercise of judgment by a judicial officer in his case, it is all the law entitles him to, "and al-

though the judgment may be erroneous, and the party injured, it is *damnum absque injuria*, for which no action lies. This, in our opinion, is the most reasonable rule, and it will be found supported by the weight of authority both in England and in this country." *Bevard vs. Hoffman*, 18 *Md. Rep.*, 483, 484. In the case of injury to property, however unintentional the act, the party injured has his action for damages; even in cases of extreme necessity, all perfect rights have their remedy, but imperfect rights have none.

In New Jersey, Delaware, Virginia, Florida, Louisiana, Indiana, Illinois, Arkansas, Texas, Iowa, Missouri, and Alabama, persons in the naval and military service of the United States, were disqualified as voters. *Cushing's Law and Prac. of Leg. Assemblies*, 23. The jealousy of federal influence excluded those in actual service from participating in elections. It would be an anomaly if the foes of the Government, its sworn enemies, should be preferred to its friends.

If the right of suffrage is a right of property, by what authority, is it taken from one class and given to another, at the option of the Conventions of the several States? The Constitution of Maryland of 1777, authorised all free men above twenty-one years, having a freehold of fifty acres in the county in which they offered to vote, and residing therein, and all free men having property in this State, above the value of 30 lbs. currency, and residing in the county, to vote. By the amendments of 1801, ch. 90. Every free *white* male citizen above twenty-one years, and no other, was entitled to the right of suffrage. Thus a large class who previously enjoyed the right were disfranchised.

The appellant's position, if tenable, would render the amendment of the Constitution of 1809, and all subsequent, excluding that class, inconsistent with the Constitution of the United States, and void. The same power which disqualified free colored men in 1801, enabled the

Convention of 1864, to disqualify "all who had been in armed hostility to the United States."

Much reliance was placed upon the case of *Killam vs. Ward,* and *Gardner's case,* cited in the note, 2 *Mass.,* 236, 244. These cases turned mainly upon the construction of an Act of the State of Massachusetts, entitled, "An Act to confiscate the estates of certain persons called absentees," who had levied war or conspired to levy war, or who, since April the 19th, 1775, had withdrawn without the permission of the Legislature, &c., and who were declared to be aliens. The power of the Legislature to pass such laws was not denied, but it was held, in *Killam's case,* he did not come within the intention of the law, and in *Gardner's,* that the Act pointed out the mode of prosecution, which had not been followed, "*modo et forma,*" *vide,* 249, 264, 266.

"Every Government ought to contain in itself the means of its own preservation." *Federalist, No.* 58. For this reason, the regulation of the right of suffrage has been reserved by the States, to themselves, and was not delegated to the General Government by the Federal Constitution. The qualifications of electors by that instrument, are expressly confined to the qualifications requisite for electors of the most numerous branch of the State Legislature. *Art.* 1, sec. 2, *Const. U. S.* 2 *Scammon,* 395, 396. *Federalist, No.* 52.

It has become a political axiom that every State should control its domestic relations. The most ultra advocate of Federal power would not deny this right to the States in the Union. It is therefore a question of the utmost consequence, whether the brief prohibition, "no State shall pass any bill of attainder or *ex post facto law,*" was designed to restrain the political power of the people over their fundamental law, or rather the civil power of the legislative branch of State Governments. No other clause of the Constitution of the United States is relied on.

Bills of attainder, as they are technically called, are such

special Acts of Legislation, as inflict capital punishments (or pains or penalties,) upon persons supposed to be guilty of high offences, without any conviction in the ordinary course of judicial proceedings. *Story's Const.*, sec. 1344.

"*Ex post facto laws* are technical expressions, which include every law which renders an act punishable in a manner in which it was not punishable when committed. They relate to penal and criminal proceedings which impose punishments and forfeitures, and not to civil proceedings which effect private rights retrospectively. Retrospective laws, divesting vested rights, unless '*ex post facto*,' do not fall within the prohibition contained in the Constitution of the United States, however repugnant they may be to the principles of sound legislation." 1 *Kent's Coms.*, sec. 19, *pp.* 409, 410, and authorities there cited.

Prohibitions on the States, are not to be enlarged by construction. To do so, would violate the spirit and object of the 9th and 10th amendments to the Constitution of the United States, viz : " The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people. The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." These were intended to prevent argumentative implications of power not delegated; to exclude any interpretation by which other powers should be assumed beyond those which are granted. The 2nd section of Article 4th of the Constitution of the United States, declares: " The citizens of each State, shall be entitled to all privileges and immunities of citizens in the several States;" yet it has been held, a particular and limited operation is to be given to the words "privileges and immunities," not a full and comprehensive one. "They do not mean the right of election, the right of holding offices or being elected." Per CHASE, C. J., 3 *H. & McHy.*, 535. If terms so broad and comprehensive as these are restrained by a consideration of the objects intended, tech-

hical terms are not to be enlarged to an extent which will impair the jurisdiction of the States. It is obvious the distinctive and obnoxious feature of *ex post facto* laws, is the exercise of a judicial function by the Legislature; punishing thereby as *crimes*, acts not before forbidden, or aggravating their punishment. The object and intention of the Act, fixes its character; that which is preventive, is not necessarily punitive, although it may be accompanied by the withdrawal of privileges previously enjoyed. The political powers of a State, its preventive means, are not to be confounded with the assumption of judicial powers by a Convention or Legislature. The former must exist for the safety of the State, the latter is prohibited for the protection of the citizen. Vindictive motives are not to be imputed to the State; if they existed, perversion of a power does not make it unconstitutional. The right of suffrage being the creature of the organic law, may be modified or withdrawn by the sovereign authority which conferred it, without inflicting any punishment on those who are disqualified.

The 4th section of Article 1st of the Constitution of Maryland, does not declare any act criminal which was not previously so, or add to, alter or change the criminal Code of the State. The Acts referred to, are generally such as come within the legal definition of treason, "levying war against the United States, or adhering to their enemies, giving them aid and comfort."—"If war be levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." 4 *Cranch*, 126. 2 *Story's Const.*, 1800. But these acts are not defined as crimes; they could not be prosecuted as such in any Court of the State, or any judgment or conviction be had under the section referred to. The actors are described by their deeds, and a civil disability imposed upon them from considerations of public policy.

79    v.23.

Anderson *vs.* Baker, *et al.*

The power thus conferred on the registrars by the Act of Assembly, carrying into execution the provisions of the Constitution, is a police or political power, closely analogous to that previously committed to the judges of election; a power, on the due exercise of which, the inauguration and succession of the several departments of the government depend.

Under the old system, the judges determined the qualifications of the voter at the polls; under the new, the registrars ascertain and enroll before hand, those who are qualified and those who are disqualified, subject alike to liability in damages, if they willfully, corruptly or maliciously, exclude any who are entitled.—The inquisitorial and offensive manner in which these duties are said to have been in some instances discharged, is a just cause for public indignation, and speedy correction by the proper authority, but not sufficient to warrant a judgment annulling the law as unconstitutional.

It has been argued that, because the 3d and 5th sections of Article 1, disqualify persons convicted of larceny and bribery, as voters, in addition to the penalties now or hereafter to be imposed by law, the disqualifications of the 4th section are to be regarded as *"in pari materia"* and penal inflictions, upon the principle of *"noscitur a sociis."*

This is not a necessary deduction. Bribery and larceny were made disqualifications by the Constitution of 1851. The clauses of the Constitution of 1864, are nearly recapitulations of the provisions in the former instrument, referring to those crimes, except that the 5th section of the Constitution of 1864 relates to the 4th of July 1851, (when the Constitution of that year took effect,) and covers all cases of bribery occurring in the mean time, not altering or changing in any manner the offence or its punishment. In section 3rd, the disqualification is dissociated from any reference to penalty, and made the consequence of conviction, in the same connection with lunacy or persons *non compos;* in section 5, it is, "in addition to the penalties now or here-

after to be imposed by law," a form of expression not materially differing from the former, or sufficiently so to justify the conclusion contended for.

It is said the provisions of the registry law, which provide the mode of appointment of the officers of registration, and authorize them to determine the qualification of voters, with the test oath, are contrary to the Bill of Rights and the Constitution of Maryland.

The first branch of this objection, as to the mode of appointment, was not pressed. It is sufficient to say, there does not appear to the Court any infringement in this respect of the 13th section of Article 2nd of the Constitution, defining the appointing power of the Governor, viz: "He shall *nominate*, and by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment or election is not otherwise herein provided for, unless a different mode of appointment be prescribed *by the law creating the office*." The Act in question, creating the office, does prescribe a different mode of appointment. Where the office is of legislative creation, the Legislature can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment. *Davis vs. The State*, 7 *Md. Rep.*, 161.

As to the supposed conflict between the Constitution of Maryland and the Bill of Rights, as it is called, such a collision can scarcely occur, according to the accepted theory of the relation between these instruments. In representative constitutional governments, they are understood to be parts of a whole, constituting an entirety, and to be interpreted as one instrument. The Declaration of Rights is an enumeration of abstract principles, (or designed to be so,) and the Constitution the practical application of those principles, modified by the exigencies of the time or circumstances of the country. "If they differ, the Constitution must be taken as a limitation of the principle previously declared, according to the subject and the language employed." *Mayor & C. C. of Balto. vs. The State*, 15 *Md. Rep.*, 459.

The Declaration of Rights is a guide to the several departments of government, in questions of doubt as to the meaning of the Constitution, and "a guard against any extravagant or undue extension of power," but does not control the Constitution itself, when it is clear and unambiguous. As far then as the registration law is a legislative enactment of the 1st, 2nd, 3rd, 4th and 5th sections of Article 1 of the Constitution, it is not restrained by the Declaration of Rights, because it proceeds from the same authority, that of the Convention.

The perpetual and irrevocable character of these disqualifications has been dwelt upon; we have said that such considerations are beyond our reach, but, happily, the duration of such clauses is more nominal than real; provisions equally perpetual in terms, have passed away with the exigency that dictated them. There is a redeeming sense of justice in the people, which may well be trusted, to remove, in the mode prescribed by the Constitution, all traces of temporary excitement, which prejudice their fellow citizens.

We are reminded of our solemn obligations to support the Federal Constitution, and yet urged to come to conclusions which would prevent all further deliberation and investigation in the Court of last resort. To adopt such a course, with our convictions, would be contrary to the best established principles and precedents.

To declare an act of a co-ordinate department of the government an unwarrantable assumption, or usurpation of power, because it is a violation of a constitutional prohibition, is an exercise of the judicial office of a grave and delicate nature, *which never can be warranted but in a clear case.* 12 *G. & J.*, 438.

"The presumption must always be in favor of the validity of laws, if the contrary is not clearly demonstrated." Per *Washington, Justice.* "It must be a clear and unequivocal breach of the Constitution, not a doubtful and argumentative implication." 15 *Md. Rep.*, 476, 477.

These axioms were applied to Acts of ordinary legislation.

The ultimate object of this appeal is, to annul the organic law of the State, the Act of a sovereign Convention, under which its present government is organized, and from which it derives its existence and authority. Our province is not to make or unmake Constitutions, but to interpret them; not by the light of reason and common sense alone, or that higher law which has been invoked, but which has no oracle, but by the text of the Constitution of the United States, as construed by its authorized expounders.

If we err in our conclusions, we congratulate ourselves there is a Supreme Court erected expressly for the final adjudication of such questions, where our judgment may be reviewed and corrected, and the rights of the citizen vindicated. To this we cheerfully defer, confident that none will more cordially concur in the result.

*Judgment affirmed.*